688 F.2d 1297
 1982-2 Trade Cases 64,973
 In re CEMENT ANTITRUST LITIGATION (MDL NO. 296).
STATE OF ARIZONA, et al., Petitioners,
v.
UNITED STATES DISTRICT COURT For the DISTRICT OF ARIZONA, Respondent,
Kaiser Cement & Gypsum Corporation, et al., Real Parties in Interest.
 No. 81-7465.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 4, 1982.
Decided Oct. 1, 1982.
 
 Josef D. Cooper, Frederick P. Furth, San Francisco, Cal., argued, for petitioners; Kenneth R. Reed, Phoenix, Ariz., Tracy R. Kirkham, Kirk A. McKinney, Cooper, Kirkham, Hainline & McKinney, P.C., Daniel S. Mason, Matthew A. Joseph, San Francisco, Cal., Peter K. Shack, Michael R. Granen, Deputy Attys. Gen., George Deukmejian, Atty. Gen., Robert H. Philibosian, Sanford N. Gruskin, Chief Asst. Attys. Gen., Las Angeles, on brief.
 David Bonderman, Washington, D.C., argued, for respondent; Jacqueline R. Denning, Richard C. Lowery, Washington, D.C., William J. Maledon, Phoenix, Ariz.,
 On Petition for Writ of Mandamus United States District Court for the District of Arizona.
 Before FERGUSON, NELSON and REINHARDT, Circuit Judges.
 REINHARDT, Circuit Judge.
 
 
 1
 Plaintiffs seek a writ of mandamus directing the district court to vacate its opinion and order in which Judge Muecke granted the defendants' motion to recuse himself pursuant to 28 U.S.C. § 455(b)(4) (1976). In re Cement and Concrete Antitrust Litigation, 515 F.Supp. 1076 (D.Ariz.1981). Petitioners request that we issue the writ pursuant to our supervisory authority under the All Writs Act, 28 U.S.C. § 1651 (1976). We have previously dismissed plaintiffs' appeal from Judge Muecke's order for lack of jurisdiction under 28 U.S.C. § 1291 (1976) and have denied plaintiffs' petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) (1976). In re Cement Antitrust Litigation, 673 F.2d 1020 (9th Cir. 1982). In our opinion we concluded, however, that the petition for a writ of mandamus would be reviewed on the merits. Id. at 1025. We now do so under our supervisory authority to insure the proper and orderly administration of the federal judicial system. See Schlagenhauf v. Holder, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964); La Buy v. Howes Leather Co., 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957).[1]
 
 I.
 History of Proceedings
 
 2
 Beginning in 1976, twenty-one separate actions were filed in federal district courts in Arizona and California alleging a conspiracy among various cement and concrete producers to fix the price of cement and concrete in violation of the antitrust laws. On September 12, 1977, the Judicial Panel on Multi-District Litigation transferred those actions to the Central District of Arizona and assigned the cases to the Honorable C. A. Muecke for coordinated or consolidated pretrial procedures. In re Cement and Concrete Antitrust Litigation, 437 F.Supp. 750 (Jud. Pan. Mult. Lit. 1977). The Panel on Multi-District Litigation cited Judge Muecke's familiarity with the litigation as one of the reasons for transferring the case to the District of Arizona. Id. at 753.
 
 
 3
 Early in 1979, Judge Muecke certified a nationwide class of public and private cement producers and two statewide governmental entity classes. The parties lodged with the court a master class list that contained the names of 210,235 putative class members who could be identified with reasonable effort. Judge Muecke actively presided over the pretrial proceedings through January of 1981, during which time he entered over 75 pretrial orders, ruled on countless motions, supervised the substantial completion of the discovery process, approved the master class list, and gave notice to class members that they could opt out of the class by written request prior to December 31, 1980.
 
 
 4
 On January 12, 1981, several of the defendants advised Judge Muecke by letter that a comparison of his 1980 financial disclosure report with the names on the master class list revealed that Judge Muecke's wife owned stock in seven of the 210,235 class members. The defendants asserted that the judge was under a per se obligation to recuse himself pursuant to 28 U.S.C. § 455(b)(4) and Canon 3(C)(1)(c) of the Code of Judicial Conduct. Judge Muecke ordered the parties to brief the question and heard oral argument on two occasions.
 
 
 5
 Judge Muecke also requested an advisory opinion from the Advisory Committee on Codes of Conduct of the Judicial Conference of the United States. The Committee responded by suggesting that Judge Muecke should disqualify himself because (1) his wife had a financial interest in the subject matter of the proceeding within the meaning of section 455, (2) his wife's interests could be substantially affected by the outcome of the proceeding within the meaning of Canon 3 of the Code of Judicial Conduct, and (3) his continued handling of the case could create the appearance of impropriety in violation of Canon 2 of the Code of Judicial Conduct. 515 F.Supp. at 1083-84. See also Advisory Comm. on Judicial Activities, Disqualification in Class Actions, Advisory Op. 68 (1981).
 
 
 6
 Judge Muecke recused himself in an opinion and order, 515 F.Supp. at 1076. The judge did not reach the issue of whether he had a financial interest in the "subject matter" of the proceeding, but rather, based his order of recusal on his conclusion that his wife's stock constituted a financial interest in a "party" to the proceeding within the meaning of 28 U.S.C. § 455(b)(4) (1976). In his opinion and order of recusal, Judge Muecke made it clear that the sole reason he disqualified himself was because he believed that section 455 imposed a per se rule of recusal in such circumstances:
 
 
 7
 I must admit that my first reaction to (respondents') position recalled the words of Mr. Bumble in Dicken's Oliver Twist: "If the law supposes that ... the law is an ass-an idiot."
 
 
 8
 ... I have concluded (,however,) that I must recuse myself, not because I feel a sense of conflict, and not because I feel that to continue would create the appearance of impropriety. I have concluded that I must recuse myself for the sole reason that the law, as written, says I must.
 
 
 9
 515 F.Supp. at 1078 (footnote omitted). Judge Muecke further indicated that he was willing and able to continue handling the multidistrict proceeding and that he would have done so were it not for section 455. Id. at 1081. Judge Muecke certified his order of recusal for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) (1976).
 
 
 10
 Plaintiffs have sought review of Judge Muecke's recusal order through three avenues: (1) an appeal pursuant to 28 U.S.C. § 1291; (2) a petition for permission to appeal pursuant to 28 U.S.C. § 1292(b); and (3) a petition for a writ of mandamus requesting this court to exercise its supervisory authority over the district courts pursuant to 28 U.S.C. § 1651. Although we dismissed the appeal under section 1291 and denied permission to appeal under section 1292(b), we noted that where a party claims exceptional circumstances, such as major disruption of the litigation resulting from an order of recusal, the party may seek a writ of mandamus in the court of appeals. In deciding to review the petition on the merits, we said, "(i)t is for just such an exceptional circumstance that the writ was designed." 673 F.2d at 1025.II.
 
 Bauman Revisited
 A. Introduction
 
 11
 In reviewing petitioners' request for a writ of mandamus, we are guided by the principles collected and distilled in Bauman v. United States District Court, 557 F.2d 650 (9th Cir. 1977). In Bauman, we expressed our concern over the unprincipled use of the writ as a means of wresting control of litigation from the district courts merely because appellate judges disagree with interlocutory rulings of the district courts or are sympathetic to arguments made in support of petitions. Such unrestrained use of mandamus would undermine the mutual respect that is an indispensable element of the relationship between federal trial and appellate courts and would "subvert the policies underlying the finality rule, 28 U.S.C. § 1291, or the carefully limited congressional scheme governing interlocutory appeals ...." Id. at 653.
 
 
 12
 In order to confine the use of mandamus to its proper office, we enunciated five general guidelines in Bauman to assist in the determination of whether mandamus is the appropriate remedy in a particular case. The guidelines are: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to attain the relief he desires; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order is an oft repeated error or manifests persistent disregard for the federal rules; and (5) whether the district court's order raises new and important problems or issues of law of first impression. Id. at 654-55. Related considerations include: whether the injury alleged by petitioners, although not correctable on appeal, is the kind that justifies invocation of our mandamus authority; whether the petition presents an issue of law which may repeatedly evade appellate review; and whether there are other compelling factors relating to the efficient and orderly administration of the district courts.
 
 
 13
 As we noted in Bauman, the guidelines are cumulative and may not all point to the same conclusion. Id. at 655. Moreover, all of the guidelines are unlikely to be met in any one case. Some are more relevant to particular categories of cases than others. Certain concepts relating to the traditional use of mandamus are not necessarily applicable in supervisory mandamus cases, or, at the least, are applied differently. The guidelines are not susceptible of mechanical application; they are not meant to supplant reasoned and independent analysis by appellate courts. In sum, the guidelines serve only as a useful starting point, an analytic framework for determinations regarding the propriety of mandamus relief.
 
 
 14
 B. The Availability and Adequacy of Other Relief and the Nature of the Harm Required for Mandamus Relief.
 
 
 15
 The first two criteria articulated in Bauman are designed to insure that mandamus, rather than some other form of relief, is the appropriate remedy. The petitioners must demonstrate that they have no other adequate means of obtaining the relief desired and that they will be damaged in a way not correctable on appeal from final judgment. There is another consideration as well: the injury must be the kind that warrants the invocation of the extraordinary remedy of mandamus.
 
 
 16
 The relief sought by petitioners is a writ directing Judge Muecke to vacate his order of recusal so that the able judge, who has an extensive working knowledge of this complex litigation, may continue to preside over the consolidated pretrial proceedings. Petitioners thus hope to avoid the inevitable costs and delay that would result from the assignment of a new judge, and seek to prevent the loss of Judge Muecke's unique working knowledge of this case. We have already denied petitioners' request to review the order of recusal under 28 U.S.C. § 1291 (direct appeal of collateral order), and 28 U.S.C. § 1292(b) (discretionary interlocutory appeal). 673 F.2d 1020. While we may be free to reconsider that decision, we decline to do so.
 
 
 17
 We do not think it would be proper to reconsider here a decision we so recently announced unless new circumstances had intervened or our earlier decision was indisputably or patently erroneous. Otherwise, we would simply be substituting the views of the individual members of this panel for the judgment of the majority of our colleagues on the panel that heard the matter previously. Therefore, while we are impressed by the well reasoned and persuasive dissent of Judge Boochever, and believe that the views he expressed have substantial merit, we conclude that petitioners' avenues of interlocutory appeal from the recusal order must remain closed.
 
 
 18
 We next consider whether a post-judgment appeal would provide an effective remedy and thus render the exercise of our mandamus authority inappropriate. Although it has been stated that "disqualification questions are fully reviewable on appeal after final judgment," In re Corrugated Container Anti-Trust Litigation, 614 F.2d 958, 960-61 (5th Cir.), cert. denied, 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980), a review of the authorities indicates that a more accurate statement of the law is that an order denying a motion for disqualification is reviewable on appeal after final judgment. See, e.g., Berger v. United States, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921); Potashnick v. Port City Construction Co., 609 F.2d 1101 (5th Cir. 1980) cert. denied, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1982); SCA Services v. Morgan, 557 F.2d 110 (7th Cir. 1977); Los Angeles Trust Deed & Mortgage Exchange v. SEC, 285 F.2d 162 (9th Cir. 1960), cert. denied, 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961); 9 J. Moore, Moore's Federal Practice P 110.13(10) at 187 n.1 (2d ed. 1982); C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure, § 3553 at 384 (1975); Comment, Disqualification For Interest of Lower Federal Judges, 71 Mich.L.Rev. 533, 547 (1973).
 
 
 19
 It is, of course, possible that petitioners could seek to challenge the recusal order after final judgment has been entered, but no such review could prevent the damage that petitioners allege they will suffer or afford effective relief therefrom. Despite the fact that the petitioners may suffer tremendous disruption, unreasonable delay, additional cost, and the loss of Judge Muecke's valuable experience, a post-judgment reversal on appeal could not provide a remedy for those injuries. Moreover, whatever collateral injuries petitioners suffer will have been incurred even if they prevail fully at trial and thus have no right to appeal from the final judgment.
 
 
 20
 Equally important, when a trial judge enters an order granting a motion for disqualification the error, if any, cannot serve as a basis for reversal on appeal. In re Cement Antitrust Litigation, 673 F.2d at 1025. A party cannot ordinarily predicate a claim of prejudicial error on the fact that he was required to try his cause before one judge who was duly qualified to preside rather than another. Prejudicial error does not occur simply because a particular judge fails to handle a case or some other judge does; the mere assignment of a matter to a judge does not affect the outcome of the case. It is the conduct of the judge in conducting the proceeding that gives rise to error which is prejudicial and requires reversal, not the assignment of the case to the judge.[2] Thus, despite the fact that an erroneous order of recusal may cause collateral injury to the party, the error is harmless for purposes of Federal Rule of Civil Procedure 61; therefore it does not constitute prejudicial or reversible error. See Hampton v. City of Chicago, 643 F.2d 478, 480 n.7 (7th Cir. 1981); Kelley v. Metropolitan Board of Education, 479 F.2d 810, 811 (6th Cir. 1973) (McCree, J., concurring).
 
 
 21
 We conclude that petitioners have no effective right of appeal and will be damaged in a way not correctable on appeal from final judgment. However, we must also consider the question whether petitioners have alleged the type of injury necessary to justify invocation of the mandamus remedy. In another context we stated that "(w)e have consistently rejected petitioners' position that the costs of trying massive civil actions render review after final judgment inadequate." In re Sugar Antitrust Litigation, 559 F.2d 481, 484 (9th Cir. 1977) (denying mandamus relief from an order certifying class).
 
 
 22
 There are, of course, limits to the hardships which litigants will be forced to bear as a result of erroneous interlocutory orders, even in traditional mandamus cases. In Varsic v. United States District Court, 607 F.2d 245 (9th Cir. 1979), we granted a petition for a writ of mandamus where the plaintiff was proceeding in forma pauperis and the district court erroneously transferred his case from the Central District of California to the Southern District of New York. Despite the fact that the transfer order was fully reviewable on appeal after final judgment, we found that plaintiff would suffer "peculiar hardship" and stated that
 
 
 23
 assuming that Varsic loses in the Southern District of New York, but successfully appeals the transfer order in the Second Circuit, he will again be severely prejudiced. The impact of the inevitable delay which would result from a second trial in the Central District of California following the appeal in the Second Circuit, on a person in his situation, would not be correctable on appeal.
 
 
 24
 Id. at 252 (emphasis added).
 
 
 25
 The principal damage that petitioners contend they will incur as a result of the recusal order is additional cost and unreasonable delay. Although the disruption of the proceedings may not prejudice petitioners to the same degree as the change of venue would have prejudiced Varsic, it appears that the recusal order will significantly impair the progress of this litigation. Nevertheless, we believe that there is a substantial question as to whether petitioners have demonstrated the kind of injury that would be necessary to justify the invocation of our mandamus authority in a traditional mandamus case.
 
 
 26
 Here, however, we are reviewing the petition pursuant to our supervisory mandamus authority. We are concerned with far more than the injury to these particular petitioners; we are concerned, inter alia, with the effect of the challenged order on the operation of the courts. Petitioners contend that the recusal order will have a major disruptive effect on the administration of justice in the district of Arizona or any other district to which the litigation may be transferred.[3] Moreover, they contend that the resolution of the legal question will, for reasons we consider below, add importantly to the efficient operation and administration of the district courts throughout this circuit. Under these circumstances, the degree of injury to petitioners is a less critical factor. We believe that in supervisory mandamus cases, as long as petitioners have demonstrated that they will suffer an actual injury not correctable on appeal, they have satisfied both the injury requirement and the second criterion in the Bauman analysis.
 
 
 27
 B. Oft Repeated Errors, New and Important Issues of Law, and The Need to Supervise the Administration of the Federal Judicial System
 
 
 28
 The fourth and fifth factors noted in Bauman are whether the district court's order is an oft repeated error, or manifests a persistent disregard of the federal rules, and whether the district court's order raises new and important problems or issues of law of first impression. Here, the fourth factor is absent and the fifth factor is indisputably present. It is unlikely that both of these factors would be present where a petition for mandamus presents a single issue, since one of the factors deals with repeated error while the other deals with questions of first impression.
 
 
 29
 While the two factors deal with contrasting situations, each for its own reason may implicate the duty of appellate courts to exercise supervisory control of the district courts in order to insure proper judicial administration. See generally Schlagenhauf v. Holder, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964); LaBuy v. Howes Leather Co., 352 U.S. 249, 259-60, 77 S.Ct. 309, 315-316, 1 L.Ed.2d 290 (1957) ("Supervisory control of District Courts by Court of Appeals is necessary to proper judicial administration in the federal system."); Goldblum v. National Broadcasting Corp., 584 F.2d 904, 906 n.2 (9th Cir. 1978) (mandamus appropriate for the exercise of supervisory control of district courts necessary to proper judicial administration); 9 J. Moore, Moore's Federal Practice P 110.28 at 312 (2d ed. 1982).
 
 
 30
 In the present case, it is the fifth Bauman factor that implicates our supervisory mandamus authority: we are faced with the need to resolve a significant question of first impression where the failure to do so may adversely affect the efficient operation of the district courts. See Schlagenhauf v. Holder, 379 U.S. 104, 111, 85 S.Ct. 234, 239, 13 L.Ed.2d 152 (1969) ("(I)ssue of first impression that called for construction of Rule 35 in a new context.... Court of Appeals should have also, under these special circumstances, determined the good cause issue, so as ... to settle new and important problems."); National Right to Work Legal Defense & Education Foundation, Inc. v. Richey, 510 F.2d 1239, 1243 (D.C.Cir.), cert. denied, 422 U.S. 1008, 95 S.Ct. 2631, 45 L.Ed.2d 671 (1975) (review by mandamus appropriate "where the decision will serve to clarify a question that is likely to confront a number of lower court judges in a number of suits before appellate review is possible."); 9 J. Moore, Moore's Federal Practice P 110.28 at 312-13 (2d ed. 1982) ("The courts of appeals possess the ... power to supervise the administration of justice by their district courts ... and they may review immediately questions of unusual importance the determination of which are necessary to orderly, even and efficient administration.").
 
 
 31
 Exercise of our supervisory mandamus authority is particularly appropriate when an important question of law would repeatedly evade review because of the collateral nature of the issue.[4] See Colonial Times Inc. v. Gasch, 509 F.2d 517, 524-26 (D.C.Cir.1975). In Colonial Times, the court held that mandamus could issue to correct an error in the discovery order before it. The court noted that the type of issues raised in the case before it, "while important to the general course of the litigation, are often collateral to the litigation and thus lost to appellate review in fact if not in theory." Id. at 526. The court stated that mandamus is appropriate "when the appellate court is convinced that resolution of an important, undecided issue will forestall future error in trial courts, eliminate uncertainty and add importantly to the efficient administration of justice." Id. at 524.
 
 
 32
 Similarly, in this case, an important question of first impression will evade review unless it is considered under our supervisory mandamus authority. Moreover, that question may continue to evade review in other cases as well. In cases in which district judges recuse themselves, the orders of recusal will be effectively unreviewable on appeal notwithstanding the injuries to the parties and the possible disruption of the orderly administration of the courts. While it is true that an order denying a motion for recusal might at some later time become the subject of an appeal, it would be contrary to the interest of orderly judicial administration to delay resolution of the important question before us in order to await the occurrence of such a possibility.
 
 
 33
 We believe that the petition in this case presents a new and far reaching question of major importance to the district courts, that the question is likely to continue to evade review and that its resolution would add importantly to the efficient and orderly administration of the district courts. The exercise of our supervisory mandamus authority is appropriate under such circumstances.
 
 
 34
 D. The "Clearly Erroneous as a Matter of Law" Standard
 
 
 35
 Whether Judge Muecke's recusal order is clearly erroneous as a matter of law involves a pure question of statutory construction. The meaning of the "clearly erroneous as a matter of law" standard of review is elusive at best, but especially so when a question of law of first impression is involved. If a district court were to adopt an interpretation of a statute that squarely contradicted the literal terms and clear intent of the statute, it could readily be said that the interpretation was clearly erroneous. But when a district court is faced with two plausible interpretations of a statute that has not been construed by an appellate court, it would be difficult in one sense to characterize either interpretation as "clearly erroneous". Viewed differently, however, if an appellate court were to review the interpretation adopted by the district court and reject it, that particular interpretation could at that point be said to be "clearly" erroneous. See United States v. Mehrmanesh, 652 F.2d 766, 773 (9th Cir. 1980) ("If we decide that the district court was wrong in its reading of (the statute), appellant's right to relief will be 'clear and indisputable'.") (Fletcher, J. dissenting).[5]
 
 
 36
 We believe that the test set forth by the Supreme Court for determining when a finding of fact is "clearly erroneous" is instructive where a question of law is involved as well. In United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948), the Court stated that under Rule 52(a) of the Federal Rules of Civil Procedure:
 
 
 37
 (a) finding (of fact) is "clearly erroneous" when although there is evidence to support (the district court's finding), the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.
 
 
 38
 Id. at 395, 68 S.Ct. at 542. The "firm conviction" test provides a helpful approach to our efforts to determine when a district court's interpretation of a statute falls under the third Bauman criterion-"clearly erroneous as a matter of law as that term is used in mandamus analysis," Bauman, 557 F.2d at 650. Two of our previous decisions suggest that we will characterize a ruling of a district court on a question of law as "clearly erroneous" only when, after a full review of the authorities, we are firmly convinced that the district court's interpretation was incorrect.[6]
 
 
 39
 In Mehrmanesh, we were unable to determine the meaning of the statute simply from an examination of its language. After considering the limited authorities available, we were of the view that the "question decided below was a close one." Id. 682 F.2d at 770-71. We were not firmly convinced, either way, as to what the correct result should be. We concluded, therefore, that "(w) hether or not the district court's interpretation is ultimately upheld on appeal after final judgment, we cannot now find it to be 'clearly erroneous as a matter of law ....' " Id. (quoting Bauman v. United States District Court, 557 F.2d 650, 660 (9th Cir. 1977)). In Varsic v. United States District Court, 607 F.2d 245 (9th Cir. 1979), we also could not determine the meaning of the statute simply from an examination of the language. There we reviewed the legislative history of an Employee Retirement Income Security Act venue provision, compared its language with the language used in the venue provisions of other statutes, and analyzed cases construing those other provisions. After painstaking analysis of these materials and other questions, we said "(w)hile we should be careful in attaching the adverb 'clearly' to erroneous in our hindsight review, we conclude that the test is met here." Id. at 252.
 
 
 40
 In Mehrmanesh we found the question close-we were not firmly convinced of the correct answer. In Varsic, we ultimately were. In line with the "firm conviction" test, United States Gypsum, for determining whether findings of fact are "clearly erroneous," we conclude that: when we are firmly convinced that a district court has erred in deciding a question of law, we may hold that the district court's ruling is "clearly erroneous as a matter of law as that term is used in mandamus analysis," Bauman, 557 F.2d at 660.
 
 
 41
 Moreover, we have some doubt that the district court's order need be "clearly" erroneous in supervisory mandamus cases where the petition raises an important question of law of first impression, the answer to which would have a substantial impact on the administration of the district courts. In cases in which the Supreme Court has reviewed the exercise of supervisory authority by the appellate courts over the district courts, it has not set forth any requirement that the order of the district court be "clearly erroneous" as a prerequisite to the granting of mandamus relief. See Schlagenhauf v. Holder, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964); LaBuy v. Howes Leather Co., 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957); see also Note, Supervisory and Advisory Mandamus Under the All Writs Act, 86 Harv.L.Rev. 595, 611, 615 & n.86 (1973) ("Schlagenhauf ... left no room in the area of advisory (supervisory) mandamus for a requirement of degree of error").
 
 
 42
 The requirement that the petitioner demonstrate that the order of the district court is "clearly" erroneous stems from our desire to avoid interference with the district court's control of the litigation before it. In the normal run of cases, it would be counterproductive for appellate courts to interfere when "the most that could be claimed is that the district courts have erred in ruling on matters within their jurisdiction." Schlagenhauf, 379 U.S. at 112, 85 S.Ct. at 239 (quoting Parr v. United States, 351 U.S. 513, 520, 76 S.Ct. 912, 917, 100 L.Ed. 1377 (1956)). We are hesitant to declare that a district judge has exceeded his authority[7] unless we are reasonably certain, i.e., "firmly convinced," that he has done so. But in supervisory mandamus cases involving questions of law of major importance to the administration of the district courts, the purpose of our review-and the reason for our correcting an error made by a trial judge-is to provide necessary guidance to the district courts and to assist them in their efforts to ensure that the judicial system operates in an orderly and efficient manner. Accordingly, in such cases we see no legitimate reason for refraining from exercising our supervisory authority where we can determine that an error has been made but cannot, for whatever reason, characterize the error as "clearly" erroneous.
 
 
 43
 Considering the nature of the issue before us, we believe that petitioners would be entitled to a writ were we to be firmly convinced that the district court was incorrect in its interpretation of section 455. Moreover, in light of the fact that the petition presents a question of law of first impression, the resolution of which would have a substantial effect on the orderly and efficient administration of the courts, we might issue the writ even were we simply to conclude that the district court was in error.[8]
 
 III.
 The Recusal Statute
 
 44
 We now turn to the question of the proper interpretation of section 455. Section 455 provides in part that(a) Any justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
 
 
 45
 (b) He shall also disqualify himself in the following circumstances:
 
 
 46
 ....
 
 
 47
 (4) (When) he knows that he, individually or as a fiduciary, or his spouse ... has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding ....
 
 
 48
 ....
 
 
 49
 (d) For the purposes of this section the following words or phrases shall have the meaning indicated:
 
 
 50
 (4) "financial interest" means ownership of a legal or equitable interest, however small ....
 
 
 51
 ....
 
 
 52
 (e) No justice, judge, or magistrate shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided that it is preceded by a full disclosure on the record of the basis for disqualification.
 
 
 53
 Another provision of section 455 excludes specified mutual fund investments from the definition of "financial interest."[9]
 
 
 54
 After the plaintiff class had been certified and the time had run during which class members could opt out, Judge Muecke was notified by the defendants that his wife owned stock in several of the plaintiff class members. The defendants contended that Mrs. Muecke's stock ownership constituted a financial interest in the subject matter in controversy or in a party to the proceeding and that Judge Muecke was under a per se duty to recuse himself. After extensive briefing, oral argument, and an opinion from the Advisory Committee on Codes of Conduct of the Judicial Conference of the United States, Judge Muecke recused himself on the ground that his wife's stock ownership constituted a financial interest in a party to the proceeding within the meaning of section 455(b)(4).
 
 
 55
 In his opinion Judge Muecke correctly noted that in subsection (b)(4) of the statute, the phrase "financial interest in the subject matter in controversy or in a party to the proceeding," unlike the phrase "or any other interest," is not modified by the subsequent phrase "that could be substantially affected by the outcome of the proceeding." Thus, subsection (b)(4) establishes two classes of disqualifying interests: first, "financial interests in the subject matter in controversy or in a party to the proceeding;" these interests require recusal whether or not the outcome of the proceeding could have any effect on the interests; second, "other interests;" these interests require recusal only if they could be substantially affected by the outcome of the proceeding. See In re New Mexico Natural Gas Anti-Trust Litigation, 620 F.2d 794, 796 (10th Cir. 1980). An "interest" is disqualifying whether it is held by the judge or his spouse. The issue before Judge Muecke, then, was whether his wife's stock ownership in several of the class members constituted a financial interest in a party to the proceeding or the subject matter in controversy. If such ownership constituted a financial interest in either, it is irrelevant, for purposes of recusal, whether that interest would be substantially affected by the outcome of the proceeding.
 
 
 56
 Judge Muecke held that ownership of stock in a class member constitutes a financial interest in a party to the proceeding. In so holding, Judge Muecke rejected the petitioner's arguments that, because the statute does not refer to class members and because general law does not treat class members and parties in an identical fashion, class members are not parties within the meaning of section 455. 515 F.Supp. at 1079.
 
 
 57
 Judge Muecke acknowledged that congressional silence on the question of the status of class members creates some difficulty in applying the statute:
 
 
 58
 Given that § 455 purports to adopt a per se rule regarding disqualification, it is amazing that the statute is not more specific as to when the per se rule would apply. The problems created by the language of § 455 are compounded by a dearth of legislative history on the questions before this Court. Section 455 might operate with some degree of success in the context of simple litigation. When applied to complex multidistrict class actions, however, the statute appears to break down.
 
 
 59
 ....
 
 
 60
 Despite the proliferation of class-actions in this country, there is no indication that Congress directly considered the question whether "party" under (b)(4) should be read to include "class member."
 
 
 61
 Id. at 1079.
 
 
 62
 However, Judge Muecke found unpersuasive petitioners' argument that because general law does not treat class members and parties in an identical fashion for all purposes, class members are not parties for purposes of section 455. It is true that for certain procedural purposes, class members and parties are not treated identically.[10] But, these differences in treatment are a concession to the nature of class action suits and the purposes of Rule 23: if every class member had to be treated as a party in all circumstances, the purposes of Rule 23 might in some instances be frustrated. Thus, for example, the presence of non-diverse class members will not defeat federal diversity jurisdiction so long as the class representatives and the opposing parties are diverse; e.g., Friedman v. Meyers, 482 F.2d 435 (2d Cir. 1973); see also Snyder v. Harris, 394 U.S. 332, 340, 89 S.Ct. 1053, 1058-1059, 22 L.Ed.2d 319 (1969); 13 C. Wright & A. Miller, Federal Practice and Procedure § 1755 at 550 n. 82; some courts have held that class members are not subject to discovery under Fed.R.Civ.P. 33; e.g., Fischer v. Wolfinbarger, 55 F.R.D. 129 (W.D.Ky.1971); Wainwright v. Kraftco Corp., 54 F.R.D. 532 (N.D.Ga.1972);[11] and other courts have held that class members should not be treated as parties for purposes of counterclaims under Rule 13; e.g., Donson Stores v. American Bakeries Co., 58 F.R.D. 481 (S.D.N.Y.1973).[12]
 
 
 63
 Whatever the rule may be with respect to treating class members as parties for certain procedural purposes, it is clear that class members and parties are treated in substantially the same manner in regard to the substantive benefits and burdens of judgment. Thus, Rule 23 provides that any class member who has not opted out shall be included in the judgment, whether favorable or not to the class member, Fed.R.Civ.P. 23(c)(2)-(3); a class member may appeal from an order approving a settlement to which the member objects, Ace Heating & Plumbing Co. v. Crane Co., 453 F.2d 30 (3d Cir. 1971); a class member is bound as a party for res judicata purposes, see e.g., Brown v. Vermillion, 593 F.2d 321 (8th Cir. 1979); Smith v. Alleghany Corp., 394 F.2d 381 (2d Cir.), cert. denied, 393 U.S. 939, 89 S.Ct. 300, 21 L.Ed.2d 276 (1968); 3B J. Moore, Moore's Federal Practice P 23.60 at 23-468; 13 C. Wright & A. Miller, Federal Practice & Procedure § 1784 at 178 ("According to traditional res judicata notions, a member of a class in a Rule 23 suit is considered to be a party by representation, and will be bound to the same extent as an actual party").
 
 
 64
 On some occasions, courts have expressly described class members as parties. In American Pipe & Construction Co. v. Utah, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), the Supreme Court stated "(u)nder the circumstances of this case, ... the claimed members of the class stood as parties to the suit until and unless they received notice thereof and chose not to continue." Id. at 550-51, 94 S.Ct. at 764-765. The Court held that the statute of limitations was tolled for "all members of the class who would have been parties had the suit been permitted to continue as a class action." Id. at 554, 94 S.Ct. at 766. Similarly, in comparing the status of members of an organization that had filed suit to the status of class members in a class action, the Seventh Circuit stated that "the (Supreme) Court's remarks plainly imply that the organization's members are not parties to an organizational representative suit. Yet class members are parties to class actions. See e.g., Zahn v. International Paper Co., ...." Local 194, Retail, Wholesale & Department Store Union v. Standard Brands, 540 F.2d 864, 867 (7th Cir. 1976).[13]
 
 
 65
 We need not decide the general question whether class members are in fact "parties" to a class action suit; for some purposes they are treated as such, and for other purposes they are not. Here, we need decide only if, for purposes of section 455, stock ownership in a class member constitutes an interest in "a party to the proceeding." We agree with Judge Muecke's analysis in rejecting petitioner's argument that class members are not parties within the meaning of section 455:
 
 
 66
 The problem with plaintiffs' argument is that, where it counts, class members and parties are identical. There is no question that class members are included in the benefits and burdens of a judgment on an equal basis with parties. For this reason, there appears to be no reason in logic why a financial interest "however small" in a named party to a litigation should be grounds for recusal, but that the same interest in a class member should not be. Neither the degree of conflict, nor the appearance of impropriety is altered by a litigant's classification as "party" or "class member."
 
 515 F.Supp. at 1079.[14]
 
 67
 A review of the statute's legislative history adds considerable support to Judge Muecke's ruling that, because the appearance of impropriety is similar whether the interest is in a named party or a class member, class members should be viewed as parties for purposes of recusal under the statute.
 
 
 68
 Prior to its amendment in 1974, section 455 provided that
 
 
 69
 Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest ... or is so related or connected with any party or his attorney as to render it improper, in his opinion, to sit on the trial, appeal or other proceeding therein.
 
 
 70
 The movement to amend section 455 was "spurred by the ambiguities and uncertainties" of the above language. 120 Cong.Rec. 36268 (1974) (statement of Rep. Kastenmeier). Representative Kastenmeier, the House sponsor of the bill to amend section 455, pointed to two main problems under the statute prior to its amendment. First, the statute provided no guidance on the question of how to determine the substantiality of a judge's interest in a party; second, the sole arbiter of the question of the substantiality of the judge's interest was the very judge whose impartiality was being questioned. Id. The House Judiciary Committee described the purpose of the amendment as follows: "(B)y setting specific standards, Congress can eliminate the uncertainty and the ambiguity arising from the language in the existing statute and will have aided the judges in avoiding possible criticism for failure to disqualify themselves." H.R.Rep.No.1453 at 6, 93rd Cong.2d Sess.1974; reprinted in 1974 U.S.Code Cong. & Ad.News 6351, 6355 (hereinafter cited as House Report).
 
 
 71
 At the time that Congress was considering the merits of the amended version of section 455, the American Bar Association (ABA) had adopted a new Code of Judicial Conduct. Canon 3(C)(1) of the ABA Code provided that
 
 
 72
 A judge shall disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where
 
 
 73
 ....
 
 
 74
 (c) he knows that he, individually or as a fiduciary, or his spouse ... has a financial interest in the subject matter in controversy or in a party to the proceeding.
 
 
 75
 "Financial interest" was defined in the new code as a "legal or equitable interest, however small ...." Id., Canon 3(C)(3).
 
 
 76
 Although recusal is required under the ABA Code of Judicial Conduct where the judge has a financial interest in a party, however small, Canon 3(D) of the Code specifically provides that the parties may waive this ground for recusal if they agree in writing that the interest is insubstantial and the judge discloses the basis of his disqualification on the record.[15] The Reporter for the ABA committee which formulated the Code explained why the committee adopted a waiver provision: "Because of the hardship to the litigants that could be brought about in some jurisdictions by the delay in obtaining another judge to replace a disqualified judge, the Committee decided that under specified circumstances a judge's disqualification based on economic interest ... could be waived." E. Thode, Reporter's Notes to the Code of Judicial Conduct 71 (1973).
 
 
 77
 The proposed amendment to section 455 was cast in terms very similar to Canon 3(C) of the ABA Code of Judicial Conduct. Indeed, one of the stated purposes of the amendment was to bring the statutory requirement of recusal into line with the ethical obligation imposed by the newly adopted ABA Code of Judicial Conduct. 120 Cong.Rec. 36269 (1974). However, there were significant differences between the ABA Code of Judicial Conduct and the proposed amendment to section 455. The most notable difference was the absence from the proposed amendment of a waiver provision similar to that contained in Canon 3(D). This difference was the subject of much of the congressional debate about the amendment and was the source of most of the opposition to the enactment of the new section 455.
 
 
 78
 The absence of a provision allowing waiver of a ground for disqualification by the parties when a judge holds an insubstantial interest in a party led to criticism from several quarters. The Judicial Conference of the United States expressed its disapproval of the proposed amendment. The Judicial Conference took the position that the amendment to section 455 was unnecessary in light of its recent adoption of a new judicial code. In addition, it objected to the fact that the proposed amendment did not allow waiver of disqualification when the judge's interest was insubstantial. The Judicial Conference expressed the view that a waiver provision would be in the best interests of the litigants and the administration of justice. House Report at 10-12; 1974 U.S.Code Cong. & Ad.News at 6360-61.[16]
 
 
 79
 A number of members of Congress objected to the inflexible nature of the proposed amendment. Representative Dennis of Indiana condemned the proposal as "unreasonable and unrealistic" because it lacked a waiver provision. He pointed to the possible adverse consequences both before the House Judiciary Committee and on the floor of the House:
 
 
 80
 The necessary effect of this inflexible provision is that, by legislative enactment, we could have a true Daniel come to judgment-or a Learned Hand upon the bench-and if the case involved, let us say, the Exxon Corporation, and the judge owned 20 shares of common stock, which he had inherited from his parents many years before and had never particularly thought of since, he absolutely could not sit, even though both parties to the cause preferred him-because of his expertise, learning, and integrity-to any and all other available members of the judiciary.
 
 
 81
 To me, an inflexible provision of this kind does not make good sense, does not make for the highest quality of justice, and represents an over-reaction to a problem which, so far as the Committee has been advised, is largely non-existent.
 
 
 82
 House Report at 15; 1974 U.S.Code Cong. & Ad.News at 6363. See also 120 Cong.Rec. at 36269.
 
 
 83
 Representative Smith of New York noted that the "American Bar Association generally supports the bill, but feels that the disqualification for any financial interest is unreasonable." He also raised concerns over the possible effect such a sweeping rule of disqualification could have on the federal judiciary. After arguing in favor of a waiver provision, he stated:
 
 
 84
 I think this is very important in these days when judicial manpower in our Federal courts to which this will apply is being pushed to the outer limits, because in case after case in which the judge may have a very slight financial interest, as defined in the bill, the judges will not be able to sit and must under the bill disqualify themselves, even if the parties would like to have them sit.
 
 
 85
 120 Cong.Rec. at 36270.
 
 
 86
 Nevertheless, despite repeated objections to the lack of a provision allowing waiver where the judge's interest was insubstantial, Congress refused to follow the lead of the ABA and the Judicial Conference on this point. The Senate passed the bill after Senator Burdick, Chairman of the Subcommittee on Improvements in Judicial Machinery of the Committee on the Judiciary and sponsor of the bill in the Senate, told that body that "(t)he most significant provision in these new standards would require a judge to disqualify himself in any case in which he has a financial interest, however small, in the proceeding." 119 Cong.Rec. at 33029 (1973) (remarks of Senator Burdick). Senator Burdick stressed the fact that the proposed amendment deviated from the ABA code in that the amendment did not allow for waiver of either financial interest or kinship within the third degree as grounds for disqualification. Senator Burdick explained that "(t)he rationale ... (for not allowing waiver) is that these are ... instances in which the public at large would feel a judge most certainly should disqualify himself." Id. at 33030.
 
 
 87
 The House Judiciary Committee specifically noted that the ABA Code of Judicial Conduct allowed waiver where the judge had only a small financial interest in a party, whereas the proposed amendment to section 455 did not. The Committee explained that "(w)hile the ABA canon on disqualification would permit waiver in these ... instances, the committee believes that confidence in the impartiality of federal judges is enhanced by a more strict treatment of waiver .... The statutes contain ample authority for chief judges to assign other judges to replace either a circuit judge or district court judge who becomes disqualified." House Report at 7; 1974 U.S.Code Cong. & Ad.News at 6357. The Committee also said "(n)otwithstanding the views expressed (by the Judicial Conference) it is felt that the American people are entitled to ethical behavior on the part of all three branches of the Government, not merely the Executive or legislative branches." Id. at 6361.
 
 
 88
 Congress adopted a broad and sweeping per se rule despite warnings that it might lead to major disruption of litigation and to the loss of the judge with the most expertise in a given matter, even where the judge's financial interest in the party was insubstantial. It was aware that the rule would in at least some cases create the very type of hardships that petitioners plead here. Congress weighed these hardships against the importance of public confidence in the federal judiciary and struck the balance in favor of the latter.
 
 
 89
 Given that Congress's main concern in adopting section 455 was to promote public confidence in the impartiality of the judiciary, it is entirely consistent with congressional intent to hold that a financial interest in a class member requires recusal. While Congress did not consider or discuss the status of class members when it enacted section 455, we believe that Judge Muecke's construction of the statute effectuates the expressed congressional purpose in adopting the per se rule.
 
 
 90
 We conclude that the term "party" as used in section 455 must be given its broad customary meaning rather than the narrow construction suggested by plaintiffs, and hold that for purposes of the recusal statute, the term "party" includes class members. Thus, after five years of litigation, a multi-million dollar lawsuit of major national importance, with over 200,000 class plaintiffs, grinds to a halt over Mrs. Muecke's $29.70. A new judge must now be assigned to conduct further proceedings.
 
 IV.
 Other Considerations
 
 91
 We acknowledge that petitioners are not alone in their contention that there are serious shortcomings in section 455. The per se rule of recusal of section 455(b)(4) has been subject to much criticism. See Note, Judicial Disqualification in the Federal Courts: A Proposal to Conform Statutory Provisions to Underlying Policies, 67 Iowa L.Rev. 525 (1982); Note, Disqualification of Federal District Court Judges for Bias or Prejudice: Problems, Problematic Proposals, and a Proposed Procedure, 46 Alb.L.Rev. 229, 230 (1981); Comment, Disqualification of Federal Judges for Bias or Prejudice, 46 U.Chi.L.Rev. 236, 251-68 (1978); Note, Judicial Disqualification in the Federal Courts: Maintaining an Appearance of Justice Under 28 U.S.C. § 455, 1978 U.Ill.L.F. 863, 870-85. The Judicial Conference of the United States has recently proposed to Congress that section 455 be amended.[17]
 
 
 92
 Congress discussed many of the arguments now being advanced by critics of section 455 when it amended that section in 1974. However, Congress did not discuss the question whether class members should be classified as parties for purposes of the per se rule of section 455(b)(4), nor did Congress consider whether any reasons exist for treating class action suits differently in any respect. In the words of Judge Muecke:
 
 
 93
 (I)t is somewhat surprising that Congress did not consider the effect of § 455 on the administration of class action litigation. Not only has the class action become an increasingly common form of litigation in this country, the likelihood of § 455 applying in a class action, with its many "parties", is much increased over simple litigation.
 
 
 94
 515 F.Supp. at 1080. Moreover, the administrative burden of applying section 455 in class action proceedings is far greater than in normal civil cases. Certification of the class may not occur for months, or even years, after the complaint has been filed; thus, the judge may not be able to compare his stock holdings to the class membership list until after substantial judicial resources have been invested in the litigation. Accordingly, whatever Congress may decide generally with respect to reconsidering the explicit decisions it made when it amended section 455 in 1974, the question whether and how that section should apply in class action cases would seem to warrant congressional consideration.
 
 
 95
 We note that the administrative problems of applying section 455 in class action cases are compounded by the fact that the disqualifying interest may result from the ownership of stock by a judge's spouse. Although it may be possible under most circumstances for a judge to control the extent and nature of his or her own investments, the judge may be unable to control the financial holdings or investment activities of a spouse. The day has passed when a husband can order his wife to arrange her financial affairs to suit his convenience. As increasing numbers of women establish careers, the likelihood that judges' wives will insist on asserting the right to maintain independent judgment and control over their investments also increases. Indeed, as increasing numbers of women become federal judges, the likelihood that there will be a number of judicial husbands who will pursue independent careers and treat their own investments in a similar fashion also increases. Thus, from a practical standpoint, federal judges lack control over a significant area of potential conflict under section 455: stock ownership by their spouses in class members.
 
 
 96
 It now appears that the per se rule may give rise to a greater number of conflicts-and a different kind-than initially anticipated by Congress. The underlying assumption-that conflicts can readily be avoided by judges following the advice offered by Congress with regard to the management of their financial affairs[18]-may, at least with respect to class action cases, be somewhat fallacious. We recognize that this fact does not affect the question whether a class member is a party for purposes of section 455, as that provision was enacted in 1974. We think it relevant, however, to the need for a legislative evaluation of the reasonableness and consequences of the per se rule in class action cases and to the question whether the actual benefits of applying the per se rule in such cases outweigh the resultant disruption to the orderly and efficient administration of the judicial system.[19]
 
 V.
 Conclusion
 
 97
 For the reasons stated above, we reluctantly agree with Judge Muecke that class members are parties within the meaning of section 455(b)(4), and that Mrs. Muecke's stock ownership in a class member constitutes a financial interest in a party to the proceeding. Accordingly, as Judge Muecke properly concluded, he was required to recuse himself.
 
 
 98
 The petition for the writ of mandamus is DENIED.
 
 FERGUSON, Circuit Judge, concurring:
 
 99
 I agree that Judge Muecke properly determined that he was required to recuse himself. I further agree that this court has jurisdiction under the All Writs Act to review Judge Muecke's decision.
 
 
 100
 However, this case should not be considered as one that expands the supervisory power of this court over district courts. First, the decision of the district court was one mandated by the law; this court is not reviewing an exercise of discretion. Second, the matter does not in any way determine the rights of the parties but instead is directed solely to the orderly administration of the courts, the very core of this court's supervisory power. Third, the only way in which the new and significant issue presented here could be adjudicated was by this court assuming jurisdiction under the All Writs Act.
 
 
 
 [1]
 Courts and commentators have referred to the use of mandamus to exercise supervisory authority over the district courts as "supervisory mandamus." See, e.g., Bauman v. United States District Court, 557 F.2d 650 (9th Cir. 1977); 9 J. Moore, Moore's Federal Practice P 110.28 at 312 (2d ed. 1982)
 
 
 [2]
 We do not intend to foreclose the issue of whether prejudicial error could arise where an invidious purpose underlies the assignment of a case to a particular judge. However, under the assignment system used in most, if not all, of the district courts in this circuit, such an issue is unlikely ever to arise
 
 
 [3]
 Our previous decision in In re Cement Antitrust Litigation, 673 F.2d 1020 (9th Cir. 1982), does not foreclose petitioners' contention that the recusal order will have a significant adverse impact on both the progress of this litigation and the orderly and efficient administration of the federal courts in general. Although we strongly suggested in Cement that petitioners failed to demonstrate that the recusal order would substantially delay the proceedings, we stated that the contention would be reviewed in our consideration of the merits for the petition for mandamus:
 (I)f dissatisfied with the district judge's decision and confident that the litigation will be greatly disrupted, a party may seek a writ of mandamus from the court of appeals. It is for just such an exceptional circumstance that the writ was designed. Plaintiffs have done so here and that petition will be reviewed on the merits.
 Id. at 1025 (citations omitted).
 
 
 [4]
 Although Judge Muecke's order "conclusively determine(s) the disputed question, resolve(s) an important issue completely separate from the merits of the action, and (is) effectively unreviewable on appeal from a final judgment," Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 375, 101 S.Ct. 669, 674, 66 L.Ed.2d 571 (1981) (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978)), we have previously determined that the order is not appealable under the collateral order doctrine of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), because the order does not impair a "claim of right" possessed by plaintiffs. In re Cement Antitrust Litigation, 673 F.2d 1020, 1024-25 (9th Cir. 1982)
 
 
 [5]
 Ordinarily mandamus will not issue unless the petitioner can demonstrate that his right to such relief is "clear and indisputable." Will v. Calvert Fire Insurance Co., 437 U.S. 655, 662, 98 S.Ct. 2552, 2557, 57 L.Ed.2d 504 (1978) (plurality opinion). See also Kerr v. United States District Court, 426 U.S. 394, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976); Banker's Life & Casualty Co. v. Holland, 346 U.S. 379, 74 S.Ct. 145, 98 L.Ed. 106 (1953). In Hampton v. City of Chicago, 643 F.2d 478 (7th Cir. 1981), the trial judge granted the defendants' motion that he recuse himself pursuant to section 455 on the ground that his impartiality might reasonably be questioned. Plaintiffs' petition for a writ of mandamus to vacate the recusal order was dismissed by the court of appeals with the explanation that "(w)e are not persuaded that a party in like circumstances could ever make a showing that its rights (sic) to issuance of the writ is clear and indisputable." Id. at 480
 It may be true that a petitioner can rarely, if ever, demonstrate that his right to relief is "clear and indisputable" where a trial judge has recused himself pursuant to an exercise of discretion under section 455, i.e., if the trial judge has determined that his impartiality might "reasonably" be questioned or that his interest might be "substantially" affected. However, where, as here, the trial judge finds no reason to recuse himself other than one that results from his interpretation of the statute, and the alleged error is thus solely one of law, petitioner may be able to establish a "clear and indisputable" right to relief.
 
 
 [6]
 The Second Circuit has recently employed a "firm conviction" standard to determine if a trial court's interpretation of a statute was correct. In In re International Business Machines Corp., No. 82-3037, slip op. at 4371, --- F.2d ---- at ---- (2d Cir. Aug. 13, 1982), the Second Circuit granted a petition for a writ of mandamus where the trial judge refused to take prompt action to dismiss a major antitrust enforcement action despite the fact that the Department of Justice stipulated to dismissal. The trial judge refused to enter a judgment of dismissal pending his determination of whether the Tunney Act, 15 U.S.C. § 16(b)-(h) (1976), was applicable to the stipulated dismissal
 The court stated: "Essential to IBM's argument that Judge Edelstein has abused his jurisdiction is a firm conviction that the Tunney Act does not apply to ... stipulation(s) of dismissal." Id. at 4389, at ----. The court concluded that the language of the statute and its legislative history "compelled" the conclusion that the district court's interpretation of the statute was incorrect. Id. at 4394, at ----. The Second Circuit also considered whether review by mandamus was appropriate in that case:
 We begin with the recognition that this is an extraordinary case. It has been one of the longest antitrust cases since the enactment of the Sherman Act, and involves one of the nation's largest industrial concerns. The parties in this litigation have seen four changes of Administration with corresponding shifts in civil antitrust policies. With these changes have come dozens of new attorneys. The length of the proceedings is particularly significant because of developments in the industry since the commencement of the action which, practically speaking, have rendered many of the underlying products commercially outmoded. The case also reaches us in a unique context in that both parties seek dismissal. In light of the underlying issue of first impression, i.e. whether the Tunney Act applies to Rule 41(a)(1) stipulations of dismissal, the unique nature of this case, the enormous sums of money being expended by the parties in compliance with orders for document retention which the district court will not even consider modifying until it has decided the Tunney Act question, and the length of the proceedings, we have the "extraordinary significance" required to make mandamus an appropriate consideration. See In re Attorney General, 596 F.2d 58, 64 (2d Cir. 1979). Accordingly, we proceed to a review of IBM's claims.
 Id. at 4388, at ----.
 In light of the above factors, the Second Circuit issued the writ of mandamus after having found that the district court's interpretation of the Tunney Act was wrong and that the trial judge had therefore abused his jurisdiction in refusing to dismiss the case.
 
 
 [7]
 Although mandamus is most frequently used where there has been a usurpation of judicial power or a clear abuse of discretion, Bankers Life & Casualty Co. v. Holland, 346 U.S. 379, 74 S.Ct. 145, 98 L.Ed. 106 (1953), mandamus may also be used to "compel (a district court) to exercise its authority when it is its duty to do so." Kerr v. United States District Court, 426 U.S. 394, 402, 96 S.Ct. 2119, 2123-2124, 48 L.Ed.2d 725 (1976) (quoting Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943))
 
 
 [8]
 There is, however, one further question that we would be required to decide. We could not issue the writ unless we concluded not only that Judge Muecke was not required to recuse himself because of "a financial interest ... in a party," but also that he was not required to do so because of "a financial interest in the subject matter." Although Judge Muecke did not consider the latter issue, it was fully briefed and argued by the parties both before the district court and this court. While we do not ultimately decide the question here, we have no hesitation in concluding, for purposes of our mandamus analysis, that Judge Muecke was not required to recuse himself on the latter ground
 
 
 [9]
 Section 455(d)(4)(i) provides that "Ownership in a mutual or common investment fund that holds securities is not a 'financial interest' in such securities unless the judge participates in the management of the fund ...."
 
 
 [10]
 However, for other procedural purposes they are. Class members must be given notice of any proposed dismissal or settlement and may personally appear and object at a settlement hearing, see e.g., Cannon v. Texas Gulf Sulfur Co., 55 F.R.D. 308 (S.D.N.Y.1972); see also 3 H. Newberg, Class Actions § 56606 at 564 (1977); the filing of a complaint on behalf of a class tolls the statute of limitations for all members of the class, American Pipe & Const. Co. v. Utah, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974); and when jurisdiction over a 23(b)(3) class is based on diversity, each member of the class must satisfy the $10,000 amount in controversy requirement, Zahn v. International Paper Co., 414 U.S. 291, 294, 94 S.Ct. 505, 508, 38 L.Ed.2d 511 (1973) ("Each plaintiff in a Rule 23(b)(3) class action must satisfy the jurisdictional amount ....")
 
 
 [11]
 Contra Brennan v. Midwestern Life Ins. Co., 450 F.2d 999 (7th Cir. 1971), cert. denied, 405 U.S. 921, 92 S.Ct. 957, 30 L.Ed.2d 792 (1972)
 
 
 [12]
 Contra Rodriguez v. Family Publications Service Inc., 57 F.R.D. 189 (C.D.Cal.1972)
 
 
 [13]
 Cf. Greenfield v. Villager Industries, Inc., 483 F.2d 824, 831 (3rd Cir. 1973)
 
 
 [14]
 We agree with Judge Muecke's analysis to the extent that it stands for the proposition that there is no logical basis for excluding "class member" from the definition of the term "party" as Congress meant that term to be defined when it last amended section 455. We do not understand his analysis to suggest, nor would we necessarily agree, that there is no logical or rational basis for drawing a distinction between ordinary civil cases and class actions for purposes of enacting appropriate statutory recusal provisions. Indeed, after asserting that there was "no reason in logic" for drawing such a distinction, Judge Muecke went on to point out several reasons why the application of section 455 to class actions creates substantial administrative burdens which do not occur when ordinary civil cases are involved. 515 F.Supp. at 1080-81. These arguments constitute "reasons in logic" for drawing such a distinction and we consider them infra
 
 
 [15]
 At the time Congress was debating the amendments to section 455, the Judicial Conference of the United States had adopted the ABA Code of Judicial Conduct with some minor changes. Although the ABA Code of Judicial Conduct required the finding that the interest be insubstantial before the parties could agree to waive the ground for disqualification, the Code as adopted by the Judicial Conference did not require any such finding. Rather, the parties were permitted to waive the ground for disqualification even where the judge's financial interest was substantial
 
 
 [16]
 The Department of Justice suggested that a ground for disqualification should be deemed to be waived if it is not asserted in a timely manner. In a letter to the House Judiciary Committee, the Department of Justice stated that a provision should be added to the proposed amendment requiring that "applications for disqualification ... be timely made so as to prevent applications from being filed near the end of a trial when the underlying facts were known long before. The Department of Justice recommends enactment of this legislation, amended as suggested above." House Report at 9; 1974 U.S.Code Cong. & Ad.News at 6358. The Justice Department's views evinced concern that the mandatory disqualification procedure might be used by disgruntled litigants to disrupt trials after considerable judicial resources had been invested in the proceedings
 
 
 [17]
 The proposed amendment would allow a judge to accept a waiver by the parties if the ground for disqualification did not arise until after "substantial judicial time had been devoted to the matter" and the judge's interest would not be substantially affected by the outcome. Judicial Conference of the United States, 1980 Proceedings 81. The proposed amendment also provides that even "in the absence of waiver, disqualification is not required if the judge determines that the public interest in avoiding the cost of delay of reassignment outweighs any appearance of impropriety arising from his continuing with the matter to completion." Id. The issues raised by the proposed amendment are, of course, for Congress to consider if it wishes
 
 
 [18]
 The House Judiciary Committee considered, at least in part, the burden that the amendment would impose on judges:
 Under subsection (c), the judge has a duty to inform himself about his own financial interests. This precludes use of a so called blind trust.
 ....
 Subsection (d)(4) also provides that investments in mutual funds ... are generally not "financial interests."
 These provisions of the bill with relation to disqualification based on financial interests are not intended to deprive the judge of the opportunity to make financial investments. However, they must be considered in light of Canon 5(C)(3) of the ABA Code of Judicial Conduct which provides:
 A judge should manage his investments and other financial interests to minimize the number of cases in which he is disqualified. As soon as he can do so without serious financial detriment, he should divest himself of investments and other financial interests that might require frequent disqualification.
 Therefore, a judge is free to invest. He should invest in companies which are not likely to become litigants in his court. If that should happen, then he must disqualify himself.
 H.R.Rep. at 6357. The Judiciary Committee's suggestion that a judge invest in companies that are not likely to become litigants in the judge's court is of limited utility in multidistrict class actions such as the one before Judge Muecke. There are over 200,000 class members, many of whom are corporations. It appears that disqualifications under section 455 will become the rule rather than the exception in large class actions unless judges and their families either refrain from investing or invest only in mutual or common funds.
 
 
 [19]
 There may be other, less disruptive methods of alleviating Congress's concern that a judge not be put in the position of determining whether his interest is "substantial," whether it will be "substantially affected" by the outcome of the proceeding, or whether the public interest in avoiding delay outweighs any appearance of impropriety. For example, those questions could be decided by another judge or tribunal. Such a procedure would satisfy the concern that a judge not be the arbiter of questions involving his own self-interest, yet would prevent disruption of major litigation where the public interest so dictates