In re **CEMENT AND CONCRETE ANTITRUST LITIGATION.**

**MDL Docket No. 296.**
**Master File No. CIV 76–488 A PHX CAM.**

United States District Court,
D. Arizona.

May 26, 1981.

Josef Cooper, San Francisco, Cal., Kenneth R. Reed, Chief Counsel, Antitrust Div., Phoenix, Ariz., Frederick Furth, Furth, Fahrner, Bluemle, Mason & Wong, San Francisco, Cal., for plaintiffs.

David Bonderman (Made Motion for Recusal in this Matter), Arnold & Porter, Washington, D. C., William J. Maledon, Martori, Meyer, Hendricks & Victor, George R. Carlock, Ryley, Carlock & Ralston, Phoenix, Ariz., for defendants.

## OPINION AND ORDER

MUECKE, Chief Judge.

This matter is before the Court on Motion to Recuse, pursuant to 28 U.S.C. § 455(b)(4)

and Canon 3 C(1)(c) of the Code of Judicial Conduct. I am asked to disqualify myself for the reason that my wife owns shares of stock in several members of the plaintiff class.

The present case is one of a growing number of very large antitrust class actions that have confronted the federal court system in recent years. The original suit was filed in this district in 1976. Similar actions which were filed in other parts of the country were thereafter transferred to this district by the Panel on Multidistrict Litigation. The subject matter of this case involves allegations of a nation-wide price fixing conspiracy in the cement industry. Plaintiffs are purchasers of cement or cement-containing products. In one way or another, *Cement* touches millions of people.

The history of Cement is long and complex. In the five years since it was filed, this Court has spent hundreds, if not thousands of hours reading and researching pleadings, conducting hearings, meeting with counsel, and issuing decisions. While trial is not yet underway, discovery has been substantial and is nearing completion.

In order to put defendants' motion in context, it is important to appreciate the size of the plaintiff classes. One of these classes, the National Cement Class, consists of more than 210,000 names, a substantial portion of which are corporate entities. The shareholders of these corporations would number in the millions. Before the present dispute, the class list existed only on microfiche and, to this Court's knowledge, had never been committed to hard copy.

On January 12, 1981, I received a letter from Mr. David Bonderman, on behalf of various *Cement* defendants. Mr. Bonderman advised the Court that, comparing the contents of my 1980 financial disclosure report with the names on the National Cement Class list, it appeared that my wife owned shares of stock in seven of the 210,000 class members. From this, Mr. Bonderman concluded that I was under a *per se* obligation to recuse myself pursuant to 28

U.S.C. § 455(b)(4) and Canon 3 C(1)(c) of the Code of Judicial Conduct.

I must admit that my first reaction to Mr. Bonderman's position recalled the words of Mr. Bumble in Dickens' Oliver Twist: "If the law supposes that ... the law is a ass—an idiot."[1] Upon closer review of the authority cited by Mr. Bonderman, however, it became apparent that his argument was not without support in the language of § 455 and Canon 3 C. Therefore, on January 14, 1981, the Court ordered that plaintiffs be prepared to respond to the legal arguments raised in the letter at a hearing, which was set for Friday, January 30, 1981.

The Court's decision in this matter follows extensive briefing as ordered by the Court from the parties, oral argument on two occasions, and input from the Advisory Committee on Codes of Conduct of the Judicial Conference of the United States. I have concluded that I must recuse myself, not because I feel a sense of conflict, and not because I feel that to continue would create the appearance of impropriety. I have concluded that I must recuse myself for the sole reason that the law, as written, says I must.

### 28 U.S.C. § 455 and Canon 3 C

The relevant language of § 455 and Canon 3 C is identical:

Any ... judge ... shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned. He shall *also* disqualify himself in the following circumstances:

. . . . .

He knows that he ... or his spouse ... has a *financial interest* in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding....

For the purpose of this section the following words or phrases shall have the meaning indicated:

. . . . .

---

**1.** *See also* George Chapman (1559–1634), *Revenge for Honour*, III.ii: "I am ashamed the law is such an ass."

*"Financial interest"* means ownership of a legal or equitable interest, *however small* ....

(Emphasis added).

Defendants have taken the position that my wife's stock ownership in class members constitutes a "financial interest" in either the "subject matter in controversy" or in a "party to the proceeding."

Both of these arguments could be avoided if the words "any other interest that could be substantially affected by the outcome of the proceeding" could be read to modify a disqualifying "financial interest." If this were the case, a financial interest in the "subject matter in controversy" or in "a party to the proceeding" would be disqualifying only if the interest was such that it could be "substantially affected by the outcome of the proceeding." Despite the logical attractiveness of such a reading, the only Circuit Court to have addressed the issue has rejected it:

The statute differentiates between two kinds of interests. If the judge has a direct ownership, legal or equitable, then disqualification is required regardless of the size of the interest, unless one of the specified exceptions applies. On the other hand, an interest not entailing direct ownership falls under "other interest," and requires disqualification only if the litigation could substantially affect it.

*In re New Mexico Natural Gas Antitrust Litigation*, 620 F.2d 794, 796 (10th Cir. 1980). *See also* Opinion of the Advisory Committee on Codes of Conduct of the Judicial Conference of the United States, May 7, 1981 at 3, which is attached to this Opinion as Exhibit A and incorporated by reference herein.

### The Advisory Committee's Opinion

Given the similarity between § 455 and Canon 3 C, defendants' argument raises

ethical as well as legal considerations: For this reason, all memoranda in this matter, filed in the Motion to Recuse, including a transcript of oral argument, were referred to the Advisory Committee on the Codes of Conduct with a request for an opinion, which request was first initiated by this Court to the Committee on January 29, 1981.

Upon due consideration of all materials that were provided to this Court, the Advisory Committee concluded that I should recuse myself. The Committee did not consider the first issue raised by defendants, whether my wife's stock ownership in a class member constituted a "financial interest in a *party* to the proceeding." While the Committee's opinion was not specific, it suggested the applicability of defendants' alternate arguments, that my wife's stock constitutes a "financial interest in the subject matter in controversy" or "any other interest that could be substantially affected by the outcome of the proceeding." In recommending recusal, the Committee emphasized that ethical considerations require a judge to consider "possible and potential conflicts of interest as well as actual conflicts of interest." Advisory Opinion at 4. The Committee also suggested that any eventual judgment which would result in a financial benefit to a corporation in which my wife owned stock might create the appearance of impropriety. *See* Canon 2, Code of Conduct.

### § 455

Regardless of the applicability of § 455, this Court is very persuaded by the Advisory Committee's conclusions as to Canon 3 C. Section 455 outlines the *legal* boundaries of when a judge must recuse himself. Canon 3 C defines the ethical boundaries. Even if I could legally proceed with a case, I would refuse to do so if I were to determine that it was ethically improper.

Given that § 455 purports to adopt a *per se* rule regarding disqualification, it is amazing that the statute is not more specific as to when the *per se* rule would apply. The problems created by the language of

§ 455 are compounded by a dirth of legislative history on the questions before this Court. Section 455 might operate with some degree of success in the context of simple litigation. When applied to complex multidistrict class actions, however, the statute appears to break down.

The first question raised by defendants is whether the class members in whom my wife owns stock are "parties" within the meaning of § 455(b)(4). If they are, the statute commands my recusal "however small" my wife's interest in them might be.

Despite the proliferation of class-actions in this country, there is no indication that Congress directly considered the question whether "party" under (b)(4) should be read to include "class member."

The strongest points raised by plaintiffs are that the statutory language does not refer to class members, and that general law does not treat class members and parties in an identical fashion. *See e. g. Greenfield v. Villager Industries, Inc.*, 483 F.2d 824 (3d Cir. 1973) (the purpose of class actions is to bind persons (class members) who are not "parties"); *Hawaii-Pac Venture Capital Corp. v. Rothbard*, 564 F.2d 1343 (9th Cir. 1977) (class members have no absolute right to intervene in class action).

The problem with plaintiffs' argument is that, *where it counts*, class members and parties are identical. There is no question that class members are included in the benefits and burdens of a judgment on an equal basis with parties. For this reason, there appears to be no reason in logic why a financial interest "however small" in a named party to a litigation should be grounds for recusal, but that the same interest in a class member should not be. Neither the degree of conflict, nor the appearance of impropriety is altered by a litigant's classification as "party" or "class member."

The second question raised by defendants is whether my wife's stock in class members constitutes a "financial interest" in the "subject matter in controversy." As noted above, neither the language nor the legisla-

tive history of § 455 provides much guidance as to the application of the statute to the instant situation. We know only that if my wife has such an interest, "however small," I must automatically recuse myself—even if it does not make practical sense to do so.

I find the term "subject matter in controversy" to be inherently vague. While it obviously applies to *in rem* proceedings, *see* Hearings Before the Subcommittee on Improvements in Judicial Machinery of the Committee of the Judiciary, United States Senate, 93rd Congress, July 14, 1971, and May 17, 1973, Congress has not indicated whether it is limited to such proceedings and, if it is not, how far the term extends. Although the Fourth and Tenth Circuits have determined that a "remote, contingent benefit" is not a "financial interest" within the meaning of the statute, *see In re New Mexico Natural Gas Antitrust Litigation,* 620 F.2d 794, 796 (10th Cir. 1980); *In re Virginia Electric & Power Co.,* 539 F.2d 357 (4th Cir. 1976), I am directed to no federal decisions which contain any significant discussion on the particular issue involved here—the definition of "subject matter in controversy."

Fortunately, my conclusion that the "parties" provision of § 455 is applicable to the present case makes the resolution of the "subject matter in controversy" issue unnecessary.

### Competing Considerations

As I have said, it is somewhat surprising that Congress did not consider the effect of § 455 on the administration of class action litigation. Not only has the class action become an increasingly common form of litigation in this country, the likelihood of § 455 applying in a class action, with its many "parties", is much increased over simple litigation. This is aggravated when one considers that a party cannot waive the application of § 455, either voluntarily or by estoppel, and that § 455 demands disqualification no matter how small a judge's financial interest in the litigation might be.

My surprise at Congress' failure to consider the impact of § 455 on class action litigation is also occasioned by the fact that the administrative burden of applying the *per se* rule to class actions is greater than the burden of applying it to simple litigation. Given the number of participants in a large class action, it is not an easy matter to determine whether a *per se* conflict exists. In normal litigation, a judge can simply compare his families' holdings with the names on the caption to the complaint. In a complex multidistrict class action, the litigation may be well underway before a comprehensive class list can be compiled. To switch judges in mid-stream not only wastes judicial time and energy, but can constitute a substantial administrative burden. I question whether such a result should be occasioned *per se* "however small" a judge's financial interest. I also question whether the result should be the same regardless of the stage of the litigation, and regardless whether estoppel might otherwise apply.

The problems of applying § 455, as written, to large multidistrict class action litigation are demonstrated by application of the statute to *Cement.*

Consider the amount of money involved on the question whether a judge would be influenced by potential gain to himself or his family. As computed by plaintiffs, and not contested by defendants, the *total* amount my wife could possibly be enriched by a ruling favorable to the plaintiffs (keeping in mind that a jury trial had been timely requested) is between $4.23 and $29.70. (See attached computations Exhibit B). Given the cost of educating a new judge, both to the parties and to the Government, this amount seems wholly inconsequential. In addition, consider that the stocks in question are my wife's sole and separate property, and whether Congress took community property concepts into account when imputing a spouse's interests to a judge. Finally, consider that judges are not even required to report gifts of less than $100 on the financial disclosure

reports.[2] In the face of these facts, can it seriously be contended that my continuation in this matter creates the appearance of impropriety?

Compare my wife's financial interest in this litigation with the burden of applying § 455. As I have said, this case is into its sixth year. This Court has entered 75 pretrial orders, decided countless motions, and retains a working knowledge of where the suit has been and where it is headed. Such knowledge is crucial to competent case management. To transfer five and one-half years of work and paper to a new judge seems unfair, not only to the parties, but to the unlucky transferee and will in all likelihood be the occasion for delay. Decisions which might routinely be disposed of by me may well take a new judge longer until he has the opportunity to become acquainted with the case.[3]

This Court's observation that § 455 works anomalous results when a litigation is well under way has been noted by the Advisory Committee on Codes of Conduct and the Judicial Conference of the United States. In 1980, the Committee submitted the following draft legislation to the Conference, which would add a new subsection (f) to 28 U.S.C. § 455:

> (f) Notwithstanding the foregoing provisions, if any justice, judge, magistrate, or bankruptcy judge to whom a matter has been assigned would be disqualified, after substantial judicial time has been devoted to the matter, because of the appearance, after the matter was assigned to him, of a party in which he individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest (other than an interest that could be substantially affected by the outcome), a waiver of disqualification may be accepted from the parties; in the absence of waiver, disqualification is not required if the judge determines that the public

interest in avoiding the cost of delay of reassignment outweighs any appearance of impropriety arising from his continuing with the matter to completion.

The Conference approved the foregoing, and authorized its transmission to Congress, where it is presently pending. Should Congress see fit to adopt the proposed subsection (f), many of the problems referred to in this decision would be remedied. Indeed, had proposed subsection (f) been in force today, this Court would have reached a different conclusion as to the necessity of disqualification under § 455.

### Effect of Recusal on the Future of Cement

My reluctance to let this case go would be increased if I thought it would invalidate any of the action taken in this case in the past years. I am firmly convinced, however, that my past rulings will remain intact, and that the only effect will be administrative.

Despite its other possible shortcomings, § 455 does not require disqualification until a judge "knows" that he has a financial interest. Until he is so informed, how can there be a conflict? How can there even be the appearance of impropriety? More importantly, how can it be contended that his past decisions could be affected by a financial interest of which he was unaware?

Defendants have conceded that I was unaware that the companies in whom my wife held stock were class members. After all, the National Cement Class alone contains over 210,000 members, and the class list, which was on microfiche, was not provided to the Court until this dispute arose and the Court requested this list and it was provided in a printout four feet high. Since the Court became apprised of this problem, it has made no substantive rulings. Motions have been argued, but taken under advisement pending the Court's decision on recusal.

---

**2.** *But, see* Canon 5(C)(4)(c), Code of Judicial Conduct for United States Judges.

**3.** Contributing considerably to a quick understanding of this case, is the high level of competence of the attorneys involved. This Court is deeply appreciative of the superb quality of the briefs and arguments presented by counsel, and it is a cause of personal regret that meetings with counsel will come to an end.

Given that "knowledge" of a financial interest in a class member cannot be discovered until the litigation has progressed to the point that it has produced a class list, to permit attacks on "pre-knowledge" rulings on the basis of a subsequent determination of interest would not only be illogical, it would constitute an intolerable burden to the administration of class action litigation.

In accordance with the above, I hereby recuse myself from further participation in the *Cement* portion of this litigation. Whether this ruling should also apply to the *Concrete* portion, which has not been raised in the Motion to Recuse, is a decision that should be made in light of the foregoing Opinion. This Court will entertain any proposals or motions that the parties believe appropriate.

This Court will also be in touch with the members of the Panel on Multidistrict Litigation who will determine the Court to which these proceedings will be transferred.

## EXHIBIT A

### THE ADVISORY COMMITTEE ON CODES OF CONDUCT
#### OF THE
### JUDICIAL CONFERENCE OF THE UNITED STATES
717 MADISON PLACE, N.W.
WASHINGTON, D.C. 20439

JUDGE PETER T. FAY
JUDGE DAMON J. KEITH
JUDGE ANTHONY M. KENNEDY
JUDGE CORNELIA G. KENNEDY
JUDGE JON O. NEWMAN
JUDGE FREDERICK A. DAUGHERTY
JUDGE JACOB MISHLER
JUDGE CHARLES E. SIMONS, JR.
JUDGE JOHN P. FULLAM
JUDGE J. FOY GUIN, JR.
JUDGE WILLIAM J. JAMESON
JUDGE ROBERT VAN PELT

JUDGE HOWARD T. MARKEY
    CHAIRMAN

May 7, 1981

633–6585
633–6562

The Honorable C. A. Muecke
Chief Judge, U. S. District Court
United States Courthouse
Phoenix, Arizona 85025

Dear Judge Muecke:

Your inquiry to Judge Tamm of January 29, 1981 has recently been *referred to the Advisory Committee on Codes of Conduct.*

We understand your question arises by reason of your acting as presiding judge in a multidistrict class action which has been assigned to you. It involves allegations against numerous defendants: by reason of a claimed nation-wide price fixing conspiracy. The case was brought by a large group of named plaintiffs in 1976. One of the alleged classes, known as National Cement Class, consists of over 210,000 names, almost all being corporate entities. The members of this class may have more than 10,000,000 individual shareholders. Defendants' counsel in a brief filed with you in support of their motion to recuse state that the action is against "virtually all of the national cement manufacturers."

It appears that you have been advised recently by counsel for certain named defendants that they have learned from your financial disclosure statements that either you or your wife is the owner of stock in nine members of the National Cement Class. None of the nine are named as party plaintiffs. Some documents indicate seven corporations. The number is immaterial.

You have advised that your wife does own stock in these companies through an inheritance from her mother; that the inheritance was received by

her at about the time the suit was filed. You advise that the total value of the stock so held by your wife is approximately $50,000.

It further appears undisputed that these companies are members of the class referred to in the complaint as "National Cement Class." It further appears that under the court's order any member of this class was permitted to opt out by December 31, 1980 and that none in which your wife was a shareholder did so. It follows that each of these corporations will be bound by the litigation assigned to you and will benefit from the litigation if a recovery is had.

We infer from your letter that the number of shares owned by your wife in the companies is not large and when considered in relation to the total number of shares outstanding in all nine companies may be de minimis. You have very frankly, and commendably, told us that the total value of the number of shares owned by her as it relates to your wife's total financial holdings makes it of substantial importance to her.

We first circumscribe the coverage of this opinion. This is not a case where the judge after he has spent weeks or months in a trial learns of the facts such as those which exist here. It is also not a case where during or following a long trial an attempt is made to bring in a party or parties, or create a situation, in order to disqualify the judge. This is not a case where any corporation has been added to the class in order to disqualify the judge. It is also likely, but we do not regard it as controlling in your reaching a decision, that at the time the suit was filed the grounds for the claim of disqualification were unknown to counsel and to the court.

While your letter raises indirectly the question of whether there is any judge or judge's spouse who does not have an interest in some Cement Class corporation similar to your wife's interest, we do not presently feel that that question is presented. If the multidistrict litigation committee should conclude that all federal judges available in the United States to hear the case have the same factual situation which exists in your family we will then meet that issue. We do not consider such a conclusion as a likelihood.

To review, we again mention certain undisputed facts. You are aware that your wife owns stock in a corporation or corporations which though not named parties to the lawsuit before you will be bound by its results. It is certain that these corporations, if plaintiffs are successful in the suit, will benefit financially by the result. The extent of the benefit is presently undeterminable. It is presently unknown whether the financial benefits to your wife, if any, will be substantial or will be de minimis. We do know that your wife's total stock interest in certain corporations of the class is substantial to her.

The briefs submitted to you, copies of which you have so kindly furnished each member of the Committee, discuss whether or not your wife is a party to the litigation before you.

A majority of the Committee concludes that it does not need to reach that issue. The disqualification statute, 28 USC § 455, provides in (a)(4) that a judge shall also disqualify himself in the following circumstances:

> "He knows that . . . his spouse . . . has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding. . . ."

and in the definitions provides in (d)(4):

> " 'financial interest' means ownership of a legal or equitable interest, however small. . . ."

Whether the spouse is a party or not the judge should disqualify himself if the spouse has a financial interest, however small, in the subject matter in controversy or any other interest that could be substantially affected by the outcome of the proceeding. While the other interest must be one that could be substantially affected by the outcome of the proceeding the financial interest in the subject matter in controversy is not so limited.

There are other matters which you should consider also:

That judges must report gifts amounting to over $100. This may or may not have any bearing with you as to what is substantial.

That Resolution L adopted by the Judicial Conference of the United States in October, 1971 (see IV–27 Code of Judicial Conduct for United States Judges) indicated that all judges should consider not only actual, potential or probable conflicts of interest but possible conflicts as well. The effect of possible conflicts is emphasized in the statement that the frequent practice of a judge having to advise counsel of a possible conflict is fraught with potential coercive elements which make this practice undesirable. Under the resolution you should consider not only possible conflicts but potential conflicts as well. This may also make irrelevant the question of whether she or the corporations are actually parties. Possible and potential conflicts of interest as well as actual conflicts of interest are to be considered by a judge.

That Canon 3 disqualifies a judge who holds stock in a corporation which is a party to a lawsuit regardless of how large or small the financial interest may be. That Canon 3 also states in effect that a judge should disqualify himself in a proceeding in which his impartiality might be reasonably questioned, including instances where he knows that his spouse has "any other interest that could be substantially affected by the outcome of the proceeding".

That Canon 2 requires that a judge avoid not only impropriety but the appearance of impropriety as well. From the facts outlined by you, you have knowledge of your wife's financial interest in certain of the class members. In Advisory Opinion 57 this Committee has previously suggested that the owner of stock in a parent corporation has a direct legal or equitable interest in a controlled subsidiary and where the judge knows that a party before him is controlled by a corporation in which he owns stock the judge should disqualify himself. In Advisory Opinion No. 27 it was held that although the judge's wife had no financial interest in a drug store defendant which was her lessee and which, with others, was a defendant in a class action case brought under the Sherman and Clayton Antitrust Acts and also under the antitrust laws of the state that there could be an appearance of impropriety for the husband to hear the case. You must consider whether or not your inquiry presents in substance this question, to-wit: Could you say in good conscience, if you do not recuse and later enter a judgment in this case whereby one or more of the corporations in which your wife is a stockholder receive financial benefit, that it would not have the appearance of impropriety for you to have heard the case and entered such an order?

A majority of the members of the Committee conclude that you should recuse but we emphasize to you that the Committee's function is solely advisory. The final decision in this, as in other ethical situations, remains your individual responsibility.

For the Committee,
/s/ Howard T. Markey
Chairman

---

## EXHIBIT B

### QUANTIFICATION OF MRS. MUECKE'S INTEREST IN THE LITIGATION

The insubstantiality of the Court's "other" interest in this litigation is demonstrated by Table I, set forth below. These calculations are made with the following assumptions, all designed to unrealistically maximize Mrs. Muecke's recovery:

(1) Each of the nine entities which defendants claim provide the basis for recusal files a timely claim, for the full amount of purchases set forth in the compilation of defendants' interrogatory answers, and these claims are all approved for participation against the recovery herein. This assumption is unwarranted, since certain of the entities (e. g., American Can) apparently have a miniscule claim unlikely to warrant the effort.

(2) The approved plan of distribution provides for full weighting of claims of cement-containing products purchases with claims of cement, which are included in

defendants' compilations of total purchases. (See, e. g., sales of ready-mix concrete to Carolina Power & Light by Gifford-Hill, as described in Gifford-Hill's responses to the Revised 15th Set of Interrogatories and included in defendants' compilations).

(3) The amount of recovery equals the total approved claims, such that for each $1.00 of approved purchases, the claimant receives $1.00 recovery, with the net result that all cement and cement-containing products have a net cost of zero. (By contrast, recoveries as a percentage of claimed amounts in other multidistrict antitrust actions have been less than 5%.)

(4) The nine class members pay no federal, state or local taxes on any recovery obtained.

(5) The entities in which Mrs. Muecke owns stock distribute their entire recovery to shareholders in the form of dividends. (This assumption also recognizes the increase in the corporations' total assets, which is presumably reflected in the price of their stock.)

(6) With respect to ITT, Minnesota Mining and Union Oil, the full amount of the recovery is transferred from the subsidiary (which is the class member) to the "parent" in which Mrs. Muecke owns stock, or, in the case of Union Electric, from the "agent" (which is the class member) to the "principal" in which she owns stock. This assumption is obviously extremely generous to defendants since, e. g., Minnesota Mining no longer owns the subsidiary accounting for over 97% of its total "claim", and ITT no longer owns the two subsidiaries accounting for over 99% of its total "claim".

Nonetheless, employing all of these unlikely assumptions, the total benefit to Mrs. Muecke would be less than $29.70. By discarding assumption (6), above, her total benefit (either by dividends or pro-rata increase of total assets) would be less than $4.23.

TABLE I

Calculations of Mrs. Muecke's Share of
100% Recovery (Ignoring Corporate Income tax)

| | (a) Shares Mrs. Muecke Owns | (b) Total Shares Outstanding | (c) Total Cement or Cement-Containing Products Purchases and Assumed 100% Recovery | (d) Mrs. Muecke's Share of 100% Recovery |
|---|---|---|---|---|
| American Can Co. | 125 | 19,327,543 | $ 244.23 | $ .00158 |
| Carolina P. & L. | 150 | 45,886,288 | 261,976.71 | .85639 |
| Continental Oil Co. | 200 | 107,673,296 | 15,518.45 | .02883 |
| Potomac Electric Power Co. | 150 | 41,658,461 | 929,730.68 | 3.34768 |
| Peoples Energy Corp. | 100 | 26,753,459 | 15,261.68 | .05705 |
| Excluding Subsidiaries | | | 594.68 | .00222 |
| Union Electric Co. | 100 | 58,796,909 | 594,203.96 | 1.01060 |
| Excluding Agents | | | –0– | –0– |
| Union Oil | 200 | 173,288,776 | 19,945,245.96 | 23.01960 |
| Excluding Subsidiaries | | | –0– | –0– |
| 3M | 50 | 117,296,499 | 1,041,568.83 | .44399 |
| Excluding Former Subsidiaries | | | 31,047.91 | .01323 |
| Excluding All Subsidiaries | | | –0– | –0– |

| | (a) Shares Mrs. Muecke Owns | (b) Total Shares Outstanding | (c) Total Cement or Cement-Containing Products Purchases and Assumed 100% Recovery | (d) Mrs. Muecke's Share of 100% Recovery |
|---|---|---|---|---|
| ITT | 200 | 115,780,173 | 537,881.57 | .92914 |
| Excluding Former Subsidiaries | | | 13.50 | .00002 |
| Excluding All Subsidiaries | —— | ———— | —0— | —0— |
| Total Including All Subsidiaries And Agents: | 1,275 | 706,461,404 | 23,347,632.07 | $29.69486 |
| Total Excluding Former Subsidiaries: | | | 21,799,243.08 | $28.33498 |
| Total Excluding All Subsidiaries and Agents: | | | 1,214,064.75 | $ 4.23670 |

Notes:

(a) See Court's Exhibit A, distributed at January 30, 1981 hearing.

(b) As of 12/31/79, except for Peoples Energy Corp., which is as of 9/30/79. Source: Standard & Poor's.

(c) As reflected in Defendants' "Summary of Sales Set Forth in Interrogatory Answers" (filed March 5, 1981).

(d) Entries in this column are the result of dividing the column (a) entry for the entity in which Mrs. Muecke owns stock by the corresponding column (b) entry, and multiplying the result by the column (c) entry on the appropriate line.