972 F.2d 1346
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Paul Suren MOSESIAN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee
v.
Lawrence Clay ROCKER, Defendant-Appellant
 Nos. 91-10188, 91-10197.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 13, 1992.
Decided Aug. 18, 1992.
Order Granting Rehearing and Modifying Memorandum
Oct. 4, 1994.
Order Vacating Oct. 4, 1993 Order, Denying Rehearing and
Rehearing En Banc and Modifying Memorandum Feb. 7, 1994.
 
 Before GOODWIN, FARRIS and POOLE, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Appellants Paul Mosesian and Lawrence Rocker appeal their convictions on one count of conspiracy and four counts of mail fraud arising from a scheme to artificially inflate the value of a race horse in order to obtain increased mortality insurance proceeds. The defendants argue that (1) the district judge should have recused himself because his involvement in the case created an appearance of impropriety; (2) the conspiracy charges were barred by the statute of limitations; (3) they received inadequate assistance from their defense counsel; (4) the mail fraud prosecution was barred by the Tenth Amendment to the United States Constitution; (5) the district judge erroneously failed to provide an appropriate instruction to the jury and incorrectly admitted certain evidence; (6) the government did not meet its burden of proof as to all elements of the mail fraud charges; and (7) the district court improperly sentenced them pursuant to the United States Sentencing Guidelines. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm the defendants' convictions and sentences.
 
 I.
 
 3
 This case involves the tale of an investment gone sour and the disappointed risk-taker's resort to unlawful means to regain his lost dollars. The subject of the ill-fated investment, a quarter horse born to a sire known for his show and breeding prowess, died under suspicious circumstances. The owner used a sham sales agreement and the United States mail to convert this unfortunate happenstance into a device for securing a payback of his losses from the insurers of the animal.
 
 
 4
 Classy Doc Bar was born a foal of the famous quarter horse Doc Bar and a mare known as Classy Red in the spring of 1973. Doc Bar had produced other offspring that had been quite successful on the performance circuit, earning in excess of $50 million. Classy Doc Bar, however, failed to extend the winning tradition of his ancestry, earning $19.00 in 1974, $90.10 in 1975, nothing in 1976 and 1977, $301.34 in 1978, and $140.84 in 1979. Classy Doc Bar also did not prove to be a productive stallion, siring an average of less than six foals per year during his lifetime.[1] Owned by David and Frances Linder of Tulare, California between 1974-78 and by Francine Linder and Charles Allen between 1978-81, Classy Doc Bar was purchased by defendant Paul Mosesian in 1981 for $275,000. Mosesian launched several failed attempts between 1982-84 to improve Classy Doc Bar's breeding performance. In 1984, Mosesian decided that he could best recoup his investment by showing Classy Doc Bar. The horse earned $744.39 that year.
 
 
 5
 Mosesian's desire to find a way to improve Classy Doc Bar's profitability was apparently motivated by a rapid decline of the cutting horse market starting in 1984. Mosesian was paying back a $250,000 loan he had obtained to facilitate the purchase of the horse, and insurance premiums on the horse amounted to $20,000 per year. By the end of 1984, Mosesian had invested approximately $500,000 in Classy Doc Bar, but the horse's value had dropped to approximately $50,000. In November, 1984 Mosesian unsuccessfully attempted to increase the mortality insurance on Classy Doc Bar to a level above the then-$500,000 limit.
 
 
 6
 Shortly thereafter, in early January 1985, Mosesian informed insurance broker Ronald Dumm that he had sold the horse to defendant Lawrence Rocker for $750,000. Rocker was to pay $50,000 by February 1, 1985 and the balance over a ten year period. Mosesian instructed Dumm to obtain an additional $250,000 in insurance coverage and forwarded to him a purchase agreement and sales contract purportedly memorializing the Mosesian-Rocker transaction. Rocker applied for mortality insurance on Classy Doc Bar on January 21, 1985. Shortly thereafter, The Insurance Company of Ireland issued a policy providing additional coverage of $150,000 on the horse. Rocker also forwarded an application signed by himself and Mosesian for an additional $100,000 coverage on March 1, 1985, but Dumm never placed the application with insurance companies for approval. Thus, the total insured value of Classy Doc Bar after the purported sale to Rocker was $650,000.
 
 
 7
 The sale of Classy Doc Bar, however, was apparently no sale at all. Rocker's down payment of $50,000 was returned to Mosesian through a series of bank transfers between accounts held by the two defendants and several companies owned by them. In addition, contrary to a specific agreement in the sales contract, Rocker never paid any of the premiums on the horse insurance policy. Mosesian paid $18,000 for insurance after the alleged sales contract was executed. Rocker also failed to pay any of the costs of boarding Classy Doc Bar and made no attempt to breed or show the horse. The value of Classy Doc Bar at the time of the purported sale to Rocker was between $25,000 and $75,000.
 
 
 8
 Classy Doc Bar died at a boarding stable in Tulare, California on April 11, 1985. The circumstances surrounding the horse's death were somewhat unusual, and its cause was indeterminable. Two veterinarians testified that Classy Doc Bar's death could not have resulted from natural causes and that the lack of any indication of a struggle by the horse was inconsistent with a hypothesis that pulmonary edema was responsible. After Classy Doc Bar's death Rocker made no attempt to collect the insurance proceeds; he admitted that he acted as if the sales contract did not exist as of the time the horse died. Rocker testified before the grand jury that between one month and six weeks after Classy Doc Bar's demise, he told Mosesian that "[he] didn't want no part of this," that he would not file an insurance claim, and that Mosesian should return his money. Mosesian, however, did attempt to collect insurance proceeds on Classy Doc Bar. His efforts included the mailing of four letters.
 
 
 9
 The first letter, dated May 20, 1985, was sent to Fred Whittet, an adjuster for the INA insurance company. INA had provided a $200,000 policy on Classy Doc Bar. Mosesian informed Whittet that a sale had occurred and that he had received the down payment from Rocker and included a proof of loss form, a copy of the purported Mosesian-Rocker sales agreement, and a copy of Rocker's $50,000 down payment check. The second letter, dated May 21, 1985, was sent to Roger Mitchell, an adjuster for GAB Business Services, Inc. Mosesian requested that GAB forward the $200,000 proceeds on the INA policy to him and again enclosed photocopies of the Mosesian-Rocker agreement and the down payment check. The third letter was sent to Whittet on June 6, 1985. It stated that Mosesian believed that the company should pay on its policy based on the alleged sales price to Rocker and was accompanied by another copy of the down payment check. Whittet's response informed Mosesian that INA had ordered appraisals on Classy Doc Bar and requested the horse's breeding records, official show records, and information about the persons who had physical custody of Classy Doc Bar during Mosesian's ownership. On July 5, 1985, Mosesian advised Whittet that he did not possess the requested information and objected to the planned appraisals. The fourth letter was dated the same day and was sent to adjuster C.W. Jukes. It demanded payment of $150,000 in insurance proceeds and threatened litigation if the demand was not met within ten days. Shortly thereafter, Mosesian sued the insurance carriers; the law firm McCormick, Barstow, Sheppard, Wayte and Carruth; McCormick, Barstow partner Gordon Park; Dumm; and investigator William Graham in California state court. See Mosesian v. Park, No. 345940-1, Superior Court of California in and for the County of Fresno (filed February 13, 1989).
 
 
 10
 On March 8, 1990, a grand jury for the Eastern District of California indicted Mosesian and Rocker on four counts of mail fraud, 18 U.S.C. § 1341, and one count each of conspiracy to commit mail fraud, 18 U.S.C. § 1871, and aiding and abetting mail fraud, 18 U.S.C. § 2. Both defendants were convicted on all counts on December 20, 1990. On April 8, 1991, Mosesian was sentenced to thirty months in federal prison and to pay a $15,000 fine and Rocker was sentenced to serve twenty four months in federal prison. The defendants timely appealed.
 
 II.
 
 11
 Mosesian and Rocker contend that Judge Coyle's ties to his former law firm, which was a defendant in the civil case related to Classy Doc Bar's death filed by Mosesian; his investments with his former law partners; his social relationships with colleagues in private practice; and his prior involvement in contentious litigation opposite Mosesian required recusal under 28 U.S.C. §§ 455(a), (b)(1), (b)(2), (b)(4), and (b)(5)(iii). "Disqualification ... is generally a matter confided to the conscience of the particular judge." Margoles v. Johns, 660 F.2d 291, 299 (7th Cir.1981) (quoting Weiss v. Hunna, 312 F.2d 711, 714 (2d Cir.), cert. denied, 374 U.S. 853 (1963)), cert. denied, 455 U.S. 909 (1982). Accordingly, we review a district judge's refusal to recuse himself for an abuse of discretion. E. & J. Gallo Winery v. Gallo Cattle Co., slip op. 6917, 6944 (9th Cir., June 22, 1992); United States v. Studley, 783 F.2d 934, 939 (9th Cir.1986). We are not persuaded that Judge Coyle was obligated to recuse himself in this case.[2]
 
 28 U.S.C. § 455(a) provides as follows:
 
 12
 Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
 
 
 13
 The statute covers situations in which there appears to be a conflict of interest, regardless of whether there is any actual bias on the part of the judge. Preston v. United States, 923 F.2d 731, 733 (9th Cir.1991) (quoting Herrington v. Sonoma County, 834 F.2d 1488, 1502 (9th Cir.1987), amended, 857 F.2d 527 (1988), cert. denied, 489 U.S. 1090 (1989)). Recusal is required if a reasonable person, knowing all of the relevant facts, would expect the judge to know of circumstances creating an appearance of partiality. Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 861 (1988); Datagate, Inc. v. Hewlett-Packard Co., 941 F.2d 864, 870 (9th Cir.1991), cert. denied, 112 S.Ct. 1667 (1992). 28 U.S.C. § 455(b) sets forth specific situations where a judge's impartiality is presumed to be impaired and requires recusal if any of the specific conditions are present. United States v. Conforte, 624 F.2d 869, 880-81 (9th Cir.), cert. denied, 449 U.S. 1012 (1980).
 
 
 14
 A. Judge Coyle's Former Association with McCormick, Barstow
 
 
 15
 28 U.S.C. § 455(b)(2) prohibits a judge from hearing a case where he previously served as a lawyer in the matter or where a partner or associate during any prior period of practice served as a lawyer on the matter during the judge's association with him or her. Thus, under certain circumstances a judge should rescue himself if his former firm may be benefited or harmed by the outcome of a particular proceeding. See Preston, 923 F.2d at 735. However, the recusal requirement is triggered only if the judge's former firm represented a party to this litigation in the same or a related matter during the time the judge was associated with it. Id. at 734. Obviously Mosesian cannot contend that McCormick, Barstow represented either the government or either defendant during Judge Coyle's tenure at the firm.
 
 
 16
 Even if we could consider the parties involved in the state court proceeding as part of the section 455(b)(2) specification, Mosesian does not allege that McCormick, Barstow represented any of the insurance companies who were the victims of Mosesian's scheme during Judge Coyle's tenure at the firm. Judge Coyle was not obligated to recuse himself because this case could result in some benefit to his former partners or their clients. See Singer v. Wadman, 745 F.2d 606, 608 (10th Cir.1984) (district judge's former partnership with defendant's lawyer does not require recusal), cert. denied, 470 U.S. 1028 (1985); National Auto Brokers v. General Motors Corp., 572 F.2d 953, 958 (2d Cir.1978) (affirming denial of recusal motion where district judge had been previously associated with firm now representing defendant), cert. denied, 439 U.S. 1072 (1979).
 
 B. Judge Coyle's Investments
 
 17
 The outcome is not different because Judge Coyle holds personal investments with some members of the McCormick, Barstow firm. 28 U.S.C. § 455(b)(4) requires a judge to abstain from hearing a case if
 
 
 18
 [h]e knows that he, individually or as a fiduciary, ... has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding.
 
 
 19
 28 U.S.C. § 455(b)(5)(iii) mandates recusal if
 
 
 20
 [the judge] ... know[§ that he] ha[s] an interest that could be substantially affected by the outcome of the proceeding.
 
 
 21
 There is no allegation that Judge Coyle holds any financial interest in the horse at issue in this case or in the parties. Thus, recusal under this provision would be necessary only if Judge Coyle had some "other interest" that would be "substantially affected" by the outcome of the government's case against Mosesian and Rocker. See In re Cement Antitrust Litigation, 515 F.Supp. 1076, 1078 (D.Ariz.1981), mandamus denied, 688 F.2d 1297 (9th Cir.1982), aff'd sub nom., Arizona v. United States District Court, 459 U.S. 1191 (1983). Mosesian has not identified the members of the McCormick, Barstow firm with which Judge Coyle is alleged to have personal investments. Nor has Mosesian alleged that Judge Coyle holds investments with Gordon Park, who represents the insurance companies sued by Mosesian in state court and who is himself a defendant in that state court action. This case is therefore not governed by the rule forbidding a judge to preside where his business partner represents a party that stands to be directly benefited by the proceeding at issue. See Potashnick v. Port City Constr. Co., 609 F.2d 1101, 1110-1111 (5th Cir.), cert. denied, 449 U.S. 820 (1980); Levin v. Weissman, 594 F.Supp. 322, 330 n. 17 (E.D.Pa.1984), aff'd, 760 F.2d 258 (3d Cir.1985). And there has been no allegation that any of the McCormick, Barstow members represent or have represented Judge Coyle in any unrelated proceeding. See Potashnik, 609 F.2d at 1111.
 
 
 22
 Mosesian offers a vague allegation that the profits earned by Judge Coyle through his investments with his former law partners will increase if the conviction in this case stands. He asserts that a government victory here will aid the insurance companies in the state court case, which in turn will increase the fees or profits earned by McCormick, Barstow. Some of those increased profits would be invested by Judge Coyle's former partners in the common venture, which could possibly inure to the benefit of the district judge. We think this imagined scenario is nothing more than a "trivial or insignificant matter[ ] that merely furnish[es a] springboard[ ] for speculation." Margoles, 660 F.2d at 298. That is not enough to require recusal. Id.; In re Drexel Burnham Lambert, Inc., 861 F.2d 1307, 1313 (2d Cir.1988) (A "remote, contingent, or speculative interest" does not reasonably bring into question a judge's impartiality) (citing In re Placid Oil Co., 802 F.2d 783, 787 (5th Cir.1986)), cert. denied sub nom., Milken v. SEC, 490 U.S. 1102 (1989).
 
 C. Judge Coyle's Social Relationships
 
 23
 The Judge's social contacts with his former colleagues in practice is likewise an insufficient ground for recusal. For such relationships to mandate disqualification, the judge must be at risk of creating an appearance of personal bias. See United States v. Alabama, 582 F.Supp. 1197, 1203-04 (N.D.Ala.1984), aff'd, 762 F.2d 1021 (11th Cir.1985). Defendants do not contend that Judge Coyle was at risk of bias because of friendships with counsel in this case; they instead assert that recusal is necessary because Judge Coyle conducts social relationships with former colleagues representing the insurance companies in the state civil case.
 
 
 24
 We reject this argument. A district judge is not a "sterile creature[ ] who don[s] judicial robes without any prior contacts in the community but rather [is] very likely to be [a] m[a]n [or] wom[a]n with a broad exposure to all kinds of citizens of all shades of persuasion and background." In re Searches Conducted on March 5, 1980, 497 F.Supp. 1283, 1290 (E.D.Wis.1980). A judge is not required to forsake established friendships and professional relationships with members of the bar just because he has taken a seat on the bench. Absent a concrete allegation that Judge Coyle could directly and personally benefit from the success his friends and professional colleagues may enjoy in litigating the state civil case no reasonable person would believe that Judge Coyle's social contacts with his former partners calls into doubt his impartiality in this case.
 
 D. Other Arguments for Recusal
 
 25
 Mosesian claims that "contentious litigation" between him and Judge Coyle when Judge Coyle was engaged in the practice of law indicates that bias requiring recusal under 28 U.S.C. § 455(b)(1) is present. We disagree. Defendants have not contended that Judge Coyle maintains hostility toward either of them or that Judge Coyle ever engaged in any unfair or improper conduct in any of the cases where he served as opposing counsel to Mosesian. But personal bias means that the judge holds "an attitude or state of mind that belies an aversion or hostility of the kind or degree that a fair-minded person could not entirely set aside when judging certain persons or causes." Conforte, 624 F.2d at 881. Such animus is not present merely because the judge disapproves of a person's prior conduct or methods. See In re Yagman, 796 F.2d 1165, 1182 (9th Cir.), modified, 803 F.2d 1085 (1986), mandamus granted, 815 F.2d 575, cert. denied, 484 U.S. 963 (1987). Judge Coyle's disapproval of Mosesian's style as a practicing attorney does not convert the Judge's prior contacts with Mosesian into a bias that would be a basis for recusal. See id.; In re Cooper, 821 F.2d 833, 838 (1st Cir.1987).
 
 
 26
 Mosesian's argument that Judge Coyle's familiarity and involvement with earlier bar proceedings against him also fails to require recusal. See Mayes v. Leipziger, 729 F.2d 605 (9th Cir.1984) (judge who has previously entered rulings adverse to a party is not obligated to recuse himself in later cases where that party is again before him); Sewer Alert Comm. v. Pierce County, 791 F.2d 796 (9th Cir.1986) (previous acquaintance with defendant and residence in county not enough to require recusal).
 
 III.
 
 27
 Mosesian and Rocker argue that the conspiracy prosecution in this case was barred by the five-year statute of limitations set forth by 18 U.S.C. § 3282. It is not apparent that either defendant raised the statute of limitations issue before trial or the judgment of conviction, as required by United States v. DeTar, 832 F.2d 1110, 1115 (9th Cir.1987). However, even if the defendants did raise the issue in the trial court, their argument is undermined by the facts.
 
 
 28
 The indictment was filed on March 9, 1990, and the record indicates that at least one overt act occurred after March 9, 1985.[3] Because the statute of limitations runs from the date of the last overt act, the indictment was timely. See Bankers Trust Co. v. Rhoades, 859 F.2d 1096 (2d Cir.1988), cert. denied, 490 U.S. 1007 (1989); United States v. Butler, 792 F.2d 1528, 1532-33 (11th Cir.), cert. denied sub nom., Waites v. United States, 479 U.S. 933 (1986); United States v. Parker, 586 F.2d 422 (5th Cir.1978), cert. denied, 441 U.S. 962 (1979); cf. Venegas v. Wagner, 704 F.2d 1144, 1146 (9th Cir.1983) (applying rule to civil conspiracy complaint), disapproved on other grounds, Wilson v. Garcia, 471 U.S. 261 (1985).
 
 
 29
 Rocker argues that the statute of limitations bars prosecution of him because his involvement in the conspiracy ended before March 9, 1985, which is the date five years prior to the date of the indictment. However, it is well-settled that an attempt to withdraw from a conspiracy is not effective if the defendant has already performed an overt act furthering the conspiracy. United States v. Luttrell, 889 F.2d 806, 810 (9th Cir.1989), vacated in part on other grounds and amended, 923 F.2d 764 (1991) (en banc), cert. denied sub nom., Kegley v. United States, 112 S.Ct. 1558 (1992); United States v. Sarault, 840 F.2d 1479, 1487 (9th Cir.1988). Here, Rocker entered into the purported sales contract and participated in the money transfer scheme designed to secure the return to him of his purported down payment money before the alleged withdrawal occurred.[4] The government's complaint against Rocker was not barred by the statute of limitations.
 
 IV.
 
 30
 Both defendants argue that they were provided inadequate assistance of trial counsel. We decline to address the merits of this claim because it must ordinarily be raised in a collateral proceeding brought pursuant to 28 U.S.C. § 2255. United States v. Robinson, slip op. 6667, 6673 (9th Cir., June 15, 1992) (citing United States v. Schaflander, 743 F.2d 714, 717 (9th Cir.1984), cert. denied, 470 U.S. 1058 (1985)); United States v. Pope, 841 F.2d 954, 958 (9th Cir.1988).
 
 
 31
 We make an exception to this general rule where the defendant has obviously been denied his right to the effective assistance of his defense attorney. Robinson, slip op. at 6673 (citing United States v. Rewald, 889 F.2d 836, 859 (9th Cir.1989), amended, 902 F.2d 18, cert. denied, 111 S.Ct. 64 (1990)). However, the grounds offered to support the claim in this case--a failure to seek a withdrawal instruction and a failure to seek dismissal due to the expiration of the statute of limitations--do not support application of the exception. Because Rocker never legally withdrew from the conspiracy and the statute of limitations did not expire before the indictment was brought, defense counsel did not commit any material and prejudicial error. Thus, the Rewald exception does not apply.
 
 V.
 
 32
 Both defendants argue that the Tenth Amendment bars the federal prosecution for mail fraud in this case since the insurance companies never actually paid Mosesian or Rocker the insurance proceeds sought through the scheme to defraud. We have previously rejected a similar argument. See United States v. Von Stephens, 774 F.2d 1411 (9th Cir.1985) (welfare fraud prosecution). Congress' reliance upon the Constitution's Postal Clause, Art. I, § 8, cl. 7, and the Necessary and Proper Clause, Art. I., § 8, cl. 18, to protect the Postal Service from misuse of the mail insulates the prosecution from the strictures of the Tenth Amendment. This is so regardless of whether the defendant's scheme is ultimately successful. United States v. Rendini, 738 F.2d 530, 533 (1st Cir.1984).
 
 VI.
 
 33
 Mosesian contends that Judge Coyle erred by failing to give sua sponte an instruction cautioning the jury about his out-of-court statements. Mosesian seeks the instruction with respect to the testimony of government witness Ronald Dumm, who testified as follows:
 
 
 34
 ... I also said that I thought that if there was--if the horse died--that we would have a problem justifying $500,000. I remember [Mosesian] saying not to worry about the [expletive] insurance companies, that he had either been screwing or screwing with insurance companies for a long time.
 
 
 35
 Mosesian does not contend that Dumm's statement was involuntarily made or identify any other factual basis for giving a cautionary instruction. Absent such a factual showing the district judge does not err in failing to provide a cautionary instruction.[5] See United States v. Maher, 645 F.2d 780, 783 (9th Cir.1981) (per curiam) (court not obligated to hold hearing on voluntariness issue if not timely dispute as to that issue is raised).
 
 
 36
 In any event, however, we do not require a cautionary instruction where "there was ample evidence, independent of the challenged admission[ ], linking [the defendant] to the crime." United States v. Williams, 428 F.2d 365, 366 (9th Cir.1970), cert. denied, 402 U.S. 985 (1971). Here, the government introduced substantial other evidence linking the defendants to the conspiracy, including the letters to the insurance adjusters, the allegedly sham contract, and the evidence probative of the money transfers of Rocker's purported down payment check.
 
 VII.
 
 37
 Both defendants contend that Judge Coyle erroneously admitted evidence demonstrating that Mosesian had invested nearly $500,000 in Classy Doc Bar, that the market value of the horse was rapidly declining, and that the insurance contracts entered into by the defendants would have entitled Mosesian to the proceeds in the event of the horse's death. We review evidentiary decisions for an abuse of discretion. United States v. Catabran, 836 F.2d 453, 456 (9th Cir.1988).
 
 
 38
 The Federal Rules of Evidence favor admission of evidence with any probative value. United States v. Carranco, 551 F.2d 1197, 1200 (10th Cir.1977). The cause of the horse's death was unexplained, and an inference of fraudulent intent may be drawn from suspicious events occurring prior to an attempt to recover insurance proceeds. See Mississippi Lofts, Inc. v. Lexington Ins. Co., 841 F.2d 251, 253-54 (8th Cir.1988). The evidence of the horse's death was therefore probative because it tended to corroborate the existence of the fraudulent sale scheme. The circumstantial nature of the evidence is not sufficient to mandate suppression. United States v. Toliver, 541 F.2d 958, 966 (2d Cir.1976) (scheme to defraud must frequently be proven by circumstantial evidence).
 
 
 39
 Evidence of the circumstances of Classy Doc Bar's demise could have been suppressed pursuant to Fed.R.Evid. 403 if its prejudicial impact outweighed its probative value. Defendants seize on that possibility, asserting that since the death of the horse was not an element of the offense charged in the indictment, any evidence about the event was likely to confuse the jury and inappropriately waste time. However, there is a difference between an element of an alleged crime and evidence tending to prove that the alleged crime occurred. The evidence indicating the unexplained demise of the horse could support an inference that Mosesian's attempt to secure the insurance proceeds was fraudulent. Thus, it was probative, and while some possibility of confusion may have existed, Judge Coyle instructed the jury that the government did not have to prove that Classy Doc Bar died at defendant's hand to secure a conviction on the charges. We find no abuse of discretion in the admission of the evidence.
 
 VIII.
 
 40
 Both defendants argue that the government failed to prove all of the elements of mail fraud because it did not demonstrate that the mailings were likely to further the fraudulent scheme. Defendants rely on the insurers reservation of the right to perform an independent appraisal before paying out any proceeds. We must affirm the defendants' mail fraud convictions if any rational jury could find that the government met its burden of proof as to each element of the crime. Luttrell, 889 F.2d at 809. A jury could easily so conclude in this case.
 
 
 41
 To secure a conviction for a violation of 28 U.S.C. § 1341, the government must prove beyond a reasonable doubt that the defendant (1) formed a scheme to defraud and (2) used the mails in furtherance of the scheme. United States v. Kellogg, 955 F.2d 1244, 1247 (9th Cir.1992); United States v. Bohonus, 628 F.2d 1167, 1171 (9th Cir.), cert. denied, 447 U.S. 428 (1980), disapproved on other grounds, McNally v. United States, 483 U.S. 350 (1987). The defendants argue that the ultimate failure of the mailings to secure the success of the scheme renders the government's case inescapably flawed. This argument fails to undermine the government's case, however, because the mailings need only be for the purpose of furthering a scheme to defraud. There is no requirement that the mailings be an essential component of the defendant's criminal plan. Bohonus, 628 F.2d at 1173; United States v. Utz, 886 F.2d 1148, 1149 (9th Cir.1989) (a scheme to defraud need not be successful to be the basis of a mail fraud prosecution), cert. denied, 110 S.Ct. 3242 (1990).[6]
 
 
 42
 Defendants attempt to avoid this rule by alternatively arguing that their mailings could not have persuaded the insurers to pay. This argument is unpersuasive because the government need only prove that the defendants intended to induce reliance, not that the victims of the scheme actually would have relied on the mailed documents.[7] Kellogg, 955 F.2d at 1247; United States v. Halbert, 712 F.2d 388, 390 (9th Cir.1983), cert. denied, 465 U.S. 1005 (1984). Mail fraud convictions involving conduct very similar to that of these defendants have been affirmed by other courts. See United States v. Serino, 835 F.2d 924 (1st Cir.1987) (defendant submitted proof of loss forms falsely inflating amount of investment in bar that had been burned by an arsonist); United States v. Rodolitz, 786 F.2d 77 (2d Cir.) (defendant created false paper trail in an attempt to show that he had spent over $1,000,000 on a building damaged in a windstorm), cert. denied, 479 U.S. 826 (1986); United States v. Cady, 567 F.2d 771 (8th Cir.1977) (conviction affirmed where defendant sent inflated medical bills in attempt to secure greater proceeds on personal injury claims), cert. denied, 435 U.S. 944 (1978). We find no deficiency in the government's proof.[8]
 
 IX.
 
 43
 Defendants' final contention is that they should not have been sentenced pursuant to the Sentencing Guidelines. They argue that since the conspiracy ended on January 15, 1985--the date of the creation of the sham contract--the Guidelines are inapplicable. See United States v. Rewald, 835 F.2d 215, 216 (9th Cir.1987) (Guidelines apply to offenses committed after their effective date of November 1, 1987); cf. United States v. Kohl, 972 F.2d 294, 298 (9th Cir. 1992) (a conspiracy "straddling" the November 1, 1987 effective date is subject to their strictures).
 
 
 44
 We review de novo the district court's application of the Sentencing Guidelines. Kohl, 972 F.2d at 297; United States v. Howard, 894 F.2d 1085, 1087 (9th Cir. 1990). Underlying factual findings are upheld unless clearly erroneous. United States v. McConney, 728 F.2d 1195, 1200 n.5 (9th Cir.) (en banc), cert. denied, 469 U.S. 824 (1984).
 
 
 45
 The district court found that the conspiracy in this case continued beyond the Guidelines' effective date of November 1, 1987. The basis for this finding is unclear. The court stated only that "the crime was committed during the time of the Guidelines through the November date." This finding may have come from a reference in the presentence report to a December 1987 letter sent by Rocker to the F.B.I. concerning the conspiracy.
 
 
 46
 But the presentence report was in error. The record did not contain a letter from Rocker to the F.B.I. in December 1987. There was a letter from Mosesian to Rocker dated December 2, 1987, concerning refund of Rocker's initial $50,000 payment for the horse. We have no way to know whether the district court's finding was based on this letter, the mistaken description in the presentence report, or some other evidence. Accordingly, we must remand the case to the district court for factual findings and legal conclusions concerning whether the conspiracy continued past November 1, 1987. If so, the Sentencing Guidelines will apply; otherwise, a pre-Guidelines sentence is called for.
 
 X.
 
 47
 The convictions are AFFIRMED. The sentences are VACATED, and the case is REMANDED for further factfinding on the duration of the conspiracy and for resentencing in accordance therewith.
 
 ORDER
 
 48
 Feb. 7, 1994.
 
 
 49
 1. The government's motion for recall of mandate and for reconsideration of order granting appellants' petitions for rehearing is GRANTED.
 
 
 50
 2. The mandate, issued October 12, 1993, is RECALLED.
 
 
 51
 3. The order of October 4, 1993, granting the appellants' petitions for rehearing and modifying the memorandum disposition is VACATED.
 
 
 52
 4. Upon reconsideration, the panel has voted to deny appellant's petitions for rehearing and to reject the suggestions for rehearing en banc.
 
 
 53
 The full court has been advised of the suggestions for rehearing en banc and no active judge has requested a vote on whether to rehear the mater en banc. Fed. R. App. P. 35.
 
 
 54
 The petitions for rehearing are DENIED and the suggestions for rehearing en banc are REJECTED.
 
 
 55
 5. The memorandum disposition, filed August 18, 1992, is modified as follows:
 
 
 56
 Parts IX and X of the memorandum, on pages 22-23, are replaced with the following:
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 An average stallion produces between 25-30 registered foals each year, and the other sons of Doc Bar produced 35-45 registered foals annually. Most of the foals produced by Classy Doc Bar were born during the years prior to 1981. In 1982, the horse produced four registered foals; in 1983, ten; and in 1984 and 1985, zero. Classy Doc Bar's offspring were not successful on the performance circuit. Only five of Classy Doc Bar's sixty registered offspring performed and they earned little money for their owners
 
 
 [2]
 Although Rocker apparently did not join Mosesian's recusal motion in the district court, we reach the merits of the issue because Mosesian indisputably raised the question in the district court and its resolution is necessary to the disposition of Mosesian's appeal. In any event, we have previously held that failure to raise the issue of recusal in the trial court does not prevent pursuit of the question on appeal. Noli v. Commissioner, 860 F.2d 1521, 1527 (9th Cir.1988)
 
 
 [3]
 On July 5, 1985 Mosesian mailed the last demand letter to an insurer
 
 
 [4]
 For the same reason we reject Rocker's contention that it was an abuse of discretion for the district judge to refuse to instruct the jury on withdrawal
 
 
 [5]
 United States v. Blue Horse, 856 F.2d 1037, 1040 (8th Cir.1988); United States v. Sebetich, 776 F.2d 412, 422 (3d Cir.1985), cert. denied, 484 U.S. 1017 (1988); United States v. McLernon, 746 F.2d 1098, 1118 (6th Cir.1984); United States v. Bondurant, 689 F.2d 1246, 1249-50 (5th Cir.1982); United States v. Groce, 682 F.2d 1359, 1366 (11th Cir.1982): United States v. Fera, 616 F.2d 590, 594-95 (1st Cir.), cert. denied, 446 U.S. 969 (1980)
 
 
 [6]
 For the same reason we reject defendants' argument that the indictment was defective. The sufficiency of an indictment is reviewed de novo, United States v. Ahumada-Avalos, 875 F.2d 681, 683 (9th Cir.), cert. denied, 493 U.S. 837 (1989), and it was adequate because it alleged both of the elements of mail fraud. The indictment did not have to allege that the government would prove that defendants caused the death of Classy Doc Bar
 
 
 [7]
 We are not convinced that the mailings could have had no effect on the insurers. Upon Classy Doc Bar's death the insurers had to determine the actual cash value of the horse. The actual cash value is defined by market value, which in turn depends upon the price a willing buyer would pay to a willing seller. Jefferson Ins. Co. v. Superior Court, 3 Cal.3d 398, 402, 475 P.2d 880, 90 Cal.Rptr. 608 (1970). Insurers obtain market value by looking to sales of comparable insured items. See, e.g., County of Los Angeles v. McDonnell Douglas Corp., 219 Cal.App.3d 715, 724-25, 268 Cal.Rptr. 294 (1990). Information about a recent sale would accordingly be very helpful to an insurer faced with the task of establishing the value of a horse
 
 
 [8]
 Defendants' argument that the district judge erroneously instructed the jury on the elements of mail fraud cannot be entertained because they have not asserted that the instructions taken as a whole are misleading or erroneous. See United States v. Beltran-Rios, 878 F.2d 1208, 1214 (9th Cir.1989). Defendants' object mainly to the language employed. That is not a basis for reversal. United States v. Wellington, 754 F.2d 1457, 1463 (9th Cir.), cert. denied sub nom., Utz v. United States, 474 U.S. 1032 (1985)